O'GARA COAL COMPANY, APPELLEE, V. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, APPELLANT.

FILED MAY 4, 1926. No. 23939.

1. **Evidence:** CONTRACTS: CUSTOMS AND USAGES. Evidence of trade custom or usage may be admitted to aid in the interpretation of a contract, but not for the purpose of changing the intrinsic character thereof.

2. **Contracts:** . EXCLUSION OF CUSTOMS AND USAGES. Trade custom or usage may be excluded from a contract by express statements therein or by implication reasonably drawn from the terms used.

3. ————: CONSTRUCTION. Where the terms of a contract are clear and unambiguous, they cannot be varied or contradicted by evidence of trade custom or usage.

APPEAL from the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. *Affirmed.*

*Crofoot, Fraser, Connolly & Stryker, James T. English, C. S. Jefferson* and *O. W. Dynes,* for appellant.

*Woods, Woods & Aitkin* and *Stout, Rose, Wells & Martin, contra.*

Heard before MORRISSEY, C. J., DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

THOMPSON, J.

This action was brought in the district court for Douglas county by the O'Gara Coal Company, hereinafter called plaintiff, a corporation organized under the laws of the state of New York, against the Chicago, Milwaukee & St. Paul Railway Company, hereinafter called defendant, a corporation organized under the laws of the state of Wisconsin, with articles of incorporation duly filed in this state, to recover damages for alleged breach of contract in the sum of $204,430.86, with interest from April 1, 1921, and costs. The case was tried to a jury, verdict for plaintiff, on which judgment was rendered for $82,801.03. Defendant appeals, and seeks reversal for claimed errors occurring at the trial, hereinafter considered.

The parts of the contract here involved, material for our consideration, are as follows:

"That the seller, in consideration of the payments, covenants and agreements to be made, kept and performed by the buyer, as hereinafter specified, hereby agrees to sell and deliver to the buyer on cars at the mine of the seller on tracks of the Illinois Central Railroad at Eldorado, Ill., from September second, nineteen hundred and twenty, to March thirty-first, nineteen hundred and twenty-one, not less than thirteen hundred and fifty tons nor more than fifteen hundred tons per working day of mine run coal (entire output of mine—mine No. 11), such coal to be of the first quality of its class, free from dirt and impurities, and in every way satisfactory to the buyer or its inspectors, who shall at all

reasonable times during the continuance of this contract have access to the seller's mines, tipples, screens, scales and yards where any coal to be furnished under this agreement is mined or handled by the seller.

"The buyer agrees to purchase and take such coal, provided the same is delivered to it in the per diem quantities above specified, and to pay the seller therefor the sum of four dollars per ton of two thousand pounds, such payments to be made on or before the 20th day of each month for all coal so delivered during the preceding month.

"It is mutually agreed that the prices named herein are based on existing rates of pay for all mine labor, and that the prices will be subject to readjustment in event existing rates of pay are changed.

"All settlements under this agreement are to be governed by actual track scale weights, ascertained at the mine or at the usual point at which car-load shipments from the mines shipping hereunder are weighed.

"Shipments made by the seller to the buyer during any one month shall constitute fulfilment of this contract for that month and the tonnage herein contracted shall be cumulative only for such one month period, except as may be otherwise mutually agreed.

"It is mutually agreed that should either party be prevented from promptly carrying out the terms hereof, by reason of strikes, lockouts, or other conditions beyond its reasonable control, such failures shall not be construed as a breach of the terms hereof, but when the cause of such failure shall have been removed, the party affected shall, and will, without delay, continue to perform its part of this contract.

"There are no understandings or agreements relative to the subject of this contract, that are not fully expressed herein, and no changes shall be made in this contract except by written agreement signed by both parties.

"It is understood that the buyer is to furnish cars."

This contract is, in law, an Illinois contract. It will be noted that the coal was to be delivered, accepted, and paid for in such state.

The material parts of the petition are: That defendant breached the contract, and by reason thereof the plaintiff was damaged as follows: Loss on difference between contract price and market price of coal sold to others, $58,431.09; loss on coal contracted for and not mined, 77,926.04 tons, upon which if mined and sold at the agreed price, plaintiff would have received a net profit of $113,756.04; cost of keeping the mine in readiness equipped for mining and delivery, $25,819.80; interest on payments not made of coal delivered when payment was due and payable, $6,423.93, amounting in all to $204,430.86. An itemized account of the above respective amounts sought to be recovered is attached to the petition, as is also a copy of the contract hereinbefore quoted; and in apt language the petition alleged compliance on part of plaintiff, and readiness and willingness at all times to comply.

The material parts of the amended answer, after admitting the incorporation of the parties, the purposes of each as set forth in the petition, and the execution of the contract, are as follows:

"Defendant denies * * * that it has failed and refused to take the entire output of said mine as required by said contract, and alleges the fact to be that it has taken all of the coal which it was obligated to take under the terms and conditions of the contract, and, in that connection, alleges that during the time of said contract it did not take all the coal which it was possible for the plaintiff to mine and produce for the reason that it was 'prevented from promptly carrying out the terms, by reason of * * * conditions beyond its reasonable control,' of which the plaintiff herein was given due and timely notice.

"Defendant says that at the time said contract was executed and for a long time prior thereto and during the period for performance of said contract, it was understood by the parties to the contract and was established by the customs, usages and practices of the coal industry of the state of Illinois, and in connection with contracts of the kind and nature of the contract between the parties hereto, that

'conditions beyond its reasonable control,' or other words of like meaning or purport in a contract for the purchase and sale of coal, meant that if the purchaser was unable to burn or use the coal specified in the contract on account of unusual conditions arising over which the party had no control, such as depressed business conditions or a large surplus of coal accumulating by reason of the inability of the purchaser to use same and other coal contracted and ordered, that the purchaser would only be required, during the time that said conditions continued, to take the amount of coal under the contract that would meet his requirements by prorating under all contracts and orders and that as the conditions change the purchaser should resume fulfilling the contract by taking the quantity agreed to be taken.

"That it was further understood by the parties and established by the custom, usage and practice of the coal industry that, if a car shortage existed so that cars were not available for the carrying out of the literal terms of the contract, similar to the one in question, the seller was only bound to furnish such quantities of coal as could be moved with the available car supply and in the proportion that the contract in question bore to the total amount of contracts for sale or purchase of the parties involved." That it has complied with each and every condition on its part under the contract up to the 5th day of November, 1920.

"That commencing about November 1, 1920, there was a radical change in conditions, in that, whereas a shortage of coal cars had existed for a long period of time on the railroads in the country, there was from that time forward a large and growing surplus of coal cars, during the balance of the period of the contract, and, as a result thereof, all persons and companies having contracts to furnish coal to the defendant immediately shipped to defendant the full amounts contracted for, until within a very short time the tracks of the railroad company were congested with loaded cars of coal and all of its storage spaces were filled; that coincident with said change in the coal car situation a very

unusual and unforeseen condition arose in the transportation business, in that business generally declined both in passenger and freight traffic to such an extent that the carloads of defendant company decreased during the contract period from twenty-five to forty per cent. below normal and below what the defendant could have reasonably anticipated at the time the contract was executed; that by reason thereof the requirements of the defendant rapidly decreased and the amount of coal in storage and on cars rapidly increased, and it became impossible for the defendant under proper economic, efficient and honest management of its railroad to take all of the coal specified in plaintiff's contract and under its contract with many others besides the plaintiff.

"That the defendant, under the terms and conditions of the contract and in accordance with the usages and customs hereinbefore alleged, promptly and from time to time notified and kept the plaintiff advised of the conditions that existed, and the plaintiff and defendant in carrying out the terms of the contract agreed that the defendant should be relieved of taking coal from the plaintiff from November 5, 1920, until November 16, 1920, and thereafter the defendant kept the plaintiff fully advised as to the existing conditions and carried out the contract by taking such coal from the plaintiff as it could use in view of the conditions that existed and its contracts with others."

The reply contains a general denial, and also specifically denies the allegations of the answer; and further states that plaintiff relied on the provisions of the contract in its entirety, and especially that part thereof that defendant was to take the entire output of mine No. 11, providing the cars necessary; and that defendant supplemented the contract with a letter written by its purchasing agent, Sackett, which letter is a part of plaintiff's petition; and that defendant is estopped by its acts in the premises from alleging or proving a custom as contained in its answer, or otherwise.

The record is so voluminous, and the questions propounded on the part of the defendant, the rulings of the court, and offers of proof of matters here presented for our considera-

tion, are so numerous as to make it impossible to take them up seriatim. However, at the trial defendant offered to prove each and every material disputed fact as to the customs pleaded and their application as alleged in its amended answer. To such questions and offers presented by defendant when seeking to prove such facts, plaintiff lodged objections, for the reasons, in substance: That the contract by its terms excluded the customs sought to be proved, if such existed; that to permit such evidence as offered would be to permit the introduction of oral testimony to vary and contradict the plain terms of a written instrument, and therefore inadmissible. The rulings of the trial court in sustaining these respective objections are here assigned as error.

It will be noted that in the amended answer the defendant alleges in its third paragraph: "That during the time of said contract it did not take all the coal which it was possible for the plaintiff to mine and produce for the reason that it was 'prevented from promptly carrying out the terms, by reason of * * * conditions beyond its reasonable control,' of which the plaintiff herein was given due and timely notice." And, then applies the custom as including in such a provision the words "car shortage" and "depressed business conditions," and that such custom was known to the parties and entered into such provision of such contract; but omits from such clause its controlling words, "strikes and lockouts." If not for the words, "strikes and lockouts," appearing in this part of the contract, then the interpretation given to the provision pleaded, by the trade, for such a length of time as to permit it to grow into a custom of including therein "car shortage" and "depressed business conditions," would be reasonable and enforceable; but that is not the situation here presented. The contract provides: "It is mutually agreed that should either party be prevented from promptly carrying out the terms hereof, by reason of strikes, lockouts, or other conditions beyond its reasonable control, such failures shall not be construed as a breach of the terms hereof, but when the cause of such failure shall

have been removed, the party affected shall, and will, without delay, continue to perform its part of this contract." This provision, taken as a whole, in law, excludes every doubt as to its meaning. It means that the contract shall not be considered as breached if either party thereto is prevented from promptly carrying out its terms by reason of strikes, lockouts, or other causes of like import and significance. If the parties desired to have included in the instrument conditions such as those arising from car shortage or extreme depression in business, they each knew the meaning of such terms and conditions and their effect upon their respective lines of business; but, notwithstanding this fact, such terms were omitted therefrom, and the parties limited the things covered by the clause to strikes, lockouts, and conditions of a kindred nature. Not only that, but, as we have seen, they followed this clause by one explanatory thereof, which is: "There are no understandings or agreements relative to the subject of this contract, that are not fully expressed herein, and no changes shall be made in this contract except by written agreement signed by both parties."

The proper construction of the clause now being considered is so aptly and succinctly stated in *Misch v. Russell*, 136 Ill. 22, 25, as to merit quoting:

"By the application of the maxim *ejusdem generis,* which is only an illustration or specific application of the broader maxim *noscuntur a sociis,* general and specific words which are capable of an analogous meaning being associated together, take color from each other, so that the general words are restricted to a sense analogous to the less general. * * * But it has never been supposed that the rule required the rejection of the general terms entirely, but only that they should be restricted to cases of the same kind as those expressly enumerated."

As we view the contract here, the intent is plainly discoverable from its context, and to permit proof of the custom pleaded of interpolating therein the words, "car shortage," or "depressed business conditions," would be to per-

mit proof of a custom which would change the intrinsic character of the clause. Such proof is not permissible. "Custom or usage in a trade or business may be shown for the purpose of interpreting a contract or controlling its execution, but not for the purpose of changing its intrinsic character." *Milwaukee & Wyoming Investment Co. v. Johnston*, 35 Neb. 554, 561. See, also, *McKee v. Wild*, 52 Neb. 9.

The contract as framed is in words of plain and easily understandable import, and that to the extent of leaving it without ambiguity or uncertainty.

"Where the terms of an express contract are clear and unambiguous, they cannot be varied or contradicted by evidence of custom or usage." 17 C. J. 508, sec. 77.

"Where a contract is clear, certain and distinct, it cannot be modified by proof of usage, for the reason that it disposes of all customs by its own terms which alone regulate the rights of the parties and determines their liabilities." *Van Hoesen v. Cameron*, 54 Mich. 609, 614.

As well said in *Postal Telegraph-Cable Co. v. Willis*, 93 Miss. 540: "It would be in the highest degree impolitic, and be the cause of introducing interminable confusion into contracts, if, when the terms of a contract are express, clear, and valid under the law, its legal effect could be controlled by some local or trade custom."

"It (evidence) is not admissible to prove a custom or usage the effect of which will be to add to an express agreement a condition or limitation which is repugnant to or inconsistent with the agreement itself. Such evidence is never admitted to vary or contradict, either expressly or by implication, the terms of an agreement, written or verbal." *Gilbert & Co. v. McGinnis*, 114 Ill. 28.

We have recognized the potency of trade customs, their applicability to trade contracts, and their impelling force when contracts such as the one here in question have been before us, and have permitted them to be introduced in evidence to assist in arriving at, as well as aiding in carrying out, the intent of the parties; but this was in instances

where doubt or uncertainty existed owing to some ambiguity in the contract. Never have we permitted evidence of custom to vary or contradict the plain terms of a contract, nor has such evidence been permitted where the contract by its terms expressly or impliedly has excluded such custom therefrom.

The trial court did not err in excluding the proffered testimony.

The judgment of the district court is,

AFFIRMED.

Note—See 3 L. R. A. n. s. 248; 27 R. C. L. 172; 3 R. C. L. Supp. 1509; 5 R. C. L. Supp. 1467.