JAMES POULTRY COMPANY, APPELLANT, v. CITY OF NE-BRASKA CITY, APPELLEE.
284 N. W. 273

FILED FEBRUARY 17, 1939. No. 30381.

*Frank A. Hebenstreit, Thomas E. Dunbar* and *Kennedy, Holland, De Lacy & Svoboda,* for appellant.

*Varro E. Tyler* and *Raymond Frerichs, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

This is a condemnation proceeding. The property in question is a leasehold on lots 4, 5 and 6, in block 79, Hail & Company's addition to Nebraska City, Nebraska, on the Missouri Pacific Railroad Company's right of way. The city of Nebraska City authorized by ordinance the construction of a viaduct. Trial was had to a jury, resulting in a verdict and judgment in favor of the plaintiff for $7,500, from which verdict and judgment the plaintiff appeals.

The pleadings admit that plaintiff is a Nebraska corporation and, since July 25, 1931, has been engaged in buying and selling gasoline, oil and automobile accessories at wholesale and retail, and in the buying, processing, dressing and selling of poultry, eggs, cream and kindred products in the city of Nebraska City. The business is located on South Eleventh street in said city, adjoining the right of way of the Missouri Pacific Railroad Company, and is carried on in a story and a half concrete, stucco and steel building, approximately 100 feet long and 40 feet wide. The defendant denied that the building was constructed of concrete, stucco and steel. The real estate, exclusive of the buildings, was leased by the plaintiff from the Missouri Pacific Railroad Company, and the improvements placed thereon were the plaintiff's, including necessary oil pumps, oil station, gasoline, kerosene and tractor fuel bulk tanks, unloading pumps and equipment, refrigeration equipment, cream-testing equipment, and all fixtures necessary and incident to such line of business. The lease was for a period of 10 years. In this connection, plaintiff alleged that the lease was continuing and set forth evidentiary facts in its amended petition to sustain such contention, the court striking such allegations from the petition and limiting the period of the leasehold to the unexpired term. This contention will be further summarized in the opinion, together with pertinent evidentiary facts upon which the plaintiff predicates error.

The second amended petition alleges the building of the

viaduct along the length of South Eleventh street immediately to and on the west side of the premises of plaintiff. The viaduct project contemplated the building of a reinforced concrete viaduct of an elevation of about 30 feet above the ground immediately in front of the plaintiff's premises, the viaduct to extend practically the full width of the street. It may be stated that the construction of the viaduct, as shown by the exhibits in evidence, does make the plaintiff's property almost inaccessible in furtherance of its business, and the plaintiff's leasehold is now between a radius of 27 to 30 feet below the traveled portion of the main highway which the viaduct seeks to serve. Plaintiff alleged that by the construction of the viaduct and condemnation proceedings its business was rendered practically useless for its purpose. This allegation was denied in the answer, and all matters pertaining thereto were also denied.

The tract of land upon which plaintiff built the improvements is located on Federal Highways 73 and 75 and on the Kansas City-Omaha main line of the Missouri Pacific railroad. The railroad tracks run approximately east and west and the highways north and south. The land leased by the plaintiff belongs to the railroad company and is in the southeast quadrant of the intersection of the highway and the railroad tracks. The lease was for a period of 10 years and was dated July 25, 1931. The plaintiff constructed on the tract of land improvements aggregating in cost $14,000. The location of the overpass is such that none of the ground leased by the plaintiff or the improvements thereon was appropriated, but access thereto was impaired to such an extent as to destroy its usefulness for a retail outlet. A small portion of some of plaintiff's buildings is on city property and presumably there without objection. The construction of the viaduct was commenced October 1, 1936. The plaintiff had been in business in Nebraska City for five years prior to the time it obtained this track-side location. This location enabled the plaintiff in its business to effect many economies; that is, it necessi-

tated less handling of its products and provided more efficient and safer loading and unloading of such products and a better market for the reception of poultry and kindred products and the processing thereof both for wholesale and retail trade. The business was likewise located in such a manner as to attract transient or tourist trade over the highways in question, such highways having direct routes north and south through the country. A summary of this evidence discloses that the location in question was an advantageous one for business of the kind and nature carried on by the plaintiff.

The measure of damages and the elements to be considered in arriving at the damages suffered are reflected by the following Nebraska authorities:

In *City of Omaha v. Kramer*, 25 Neb. 489, 41 N. W. 295, this court held: "The words, 'or damaged,' in sec. 21, art. I, of the Constitution, include all damages arising from the exercise of the right of eminent domain which cause a diminution in the value of private property." And in *Gillespie v. City of South Omaha*, 79 Neb. 441, 112 N. W. 582, this court held: "In determining the amount of such damages, the jury may consider diversion of travel, inconvenience of access, and diminution of business carried on upon said property, not as independent items of damage, but for the purpose of determining the market value of the property before and after the construction of such improvement."

In *Lowell v. Buffalo County*, 119 Neb. 776, 230 N. W. 842, it was held: "Whatever reduces the market value of real estate by the injuring of it for public use may be considered in determining the just compensation to which the property owner is entitled, where he suffers damages not common to the public generally." In the opinion, on page 781, the measure of damages was stated thus: " 'Where property has been taken or damaged for a public use, the owner is entitled to recover as compensation the difference between the value of such property immediately before and immediately after the completion of the improvement from

which the injury results.' *Chicago, R. I. & P. R. Co. v. O'Neill,* 58 Neb. 239." On page 782 it was said:

"Whatever reduces the market value of real estate by the injuring of it for public use may be considered in determining the compensation to which the property owner is entitled, where he suffers damages not common to the public generally. Authority for this view is found in former opinions:

" 'The jury in fixing damages sustained by a landowner in consequence of the appropriation, or injury, of his property for a public use may take into account every element of annoyance and disadvantage resulting from the improvement which would influence an intending purchaser's estimate of the market value of such property.' *Chicago, R. I. & P. R. Co. v. O'Neill,* 58 Neb. 239; *Kayser v. Chicago, B. & Q. R. Co.,* 88 Neb. 343."

Plaintiff contends that the court erred in excluding testimony with reference to the lease of the plaintiff, showing the duration of a lease providing for a fixed term of years and "thereafter;" that the duration of the "thereafter" period may be shown, first, by custom with respect to similar leases known to the parties; second, the oral representations by the lessor to the lessee at the inception of the lease, constituting the inducement for the lease; third, reliance upon representations and expenditures in reliance thereon, creating an estoppel; and, fourth, confirmation of such oral representations after the commencement of the lease.

Plaintiff offered to prove by the special assistant to the vice-president of the railroad, who had supervised negotiations for railroad leases for the past 15 years, and who negotiated the lease in question which was signed by him in the name of the vice-president, that the lease was for a term of 10 years and thereafter; that, where a considerable amount of investment is required on the part of the industry, the industry, once located, is considered as permanent, and such leases are seldom canceled and only upon failure to abide by the covenants of the lease or when the

railroad company requires the use of the premises, which is rare; that the lease in question would not have been terminated on May 31, 1941, since the railroad company is dependent upon industries for its revenue; that the fixed terms of railroad industrial leases are in no way representative of the tenure or term of such leases; that it is a general policy of the railroad to make such leases with relatively short, fixed terms, but that they are all let with the idea of permanency. In the light of this evidence, the witness was asked to testify how long beyond May 31, 1941, the term of the lease would have extended. All of such testimony was excluded. The witness further testified that the reason why the lease was not made for 15 or 20 years was because a longer period was not requested.

There was an offer to prove that the improvements placed on the property by the plaintiff were contemplated and discussed in connection with the lease, and a letter, dated April 30, 1931, from the division superintendent to J. Cannon, vice-president and general manager of the railroad, with reference to the improvements, was offered in evidence, wherein a lease for a period of 10 years was requested, with an option to extend the lease an additional 10 years, and stating that the plaintiff company was establishing a permanent business. A letter was offered in evidence, dated March 1, 1937, addressed to the plaintiff, wherein Mr. Cannon stated that the plaintiff's lease would not expire on May 31, 1941, and added: "It is true, however, that either party would have a right under the provisions of the lease to terminate it on or after May 31, 1941, by the serving of thirty days advance notice on the other party." Evidence was also offered to prove the extension of the lease beyond May 31, 1941, as long as the plaintiff continued in business.

The lease is specific, definite and unambiguous and is for a term of 10 years, and, by the express terms thereof, either party may terminate the tenancy on 30 days' notice at any time after the expiration of the fixed term.

The applicability of usage and custom is reflected by the

following authorities: "No rule is better settled than the rule that customs and usages cannot operate to change an express contract. It is only where the contract is ambiguous, unprecise, incomplete, or inconsistent that the search for the intent may be aided by reference to customs and usages." 2 Elliott, Contracts, sec. 1705.

" 'Where a contract is clear, certain and distinct, it cannot be modified by proof of usage, for the reason that it disposes of all customs by its own terms which alone regulate the rights of the parties and determine their liabilities.' *Van Hoesen v. Cameron*, 54 Mich. 609, 614." *O'Gara Coal Co. v. Chicago, M. & St. P. R. Co.*, 114 Neb. 584, 208 N. W. 742.

Relative to the practical construction to be given to the lease and the intention of the parties at the time the lease was executed, the following principle of law is applicable: "The practical construction put on a contract by the parties cannot control the express unambiguous provisions of the instrument itself, and, further, a practical construction, to be adopted, must be reasonable. * * * The mere opinion of the parties as to the construction of the contract, not carried into effect by any act, will not amount to a practical construction." 13 C. J. 548, 549.

The letters in evidence, one written before the making of the lease and the other after the proceedings here had been commenced, are apparently the basis for the construction given to the lease by the parties thereto.

Plaintiff contends that the alleged contemporaneous agreement not to exercise the option to terminate the lease was confirmed by the letter of March 1, 1937, from Mr. Cannon to the plaintiff James, in view of the statement made in the letter: "It is true, however, that either party would have a right under the provisions of the lease to terminate it on or after May 31, 1941, by the serving of thirty days advance notice on the other party."

"When a lease is renewed in accordance with a covenant for renewal the new term is to be treated as part of the original lease so far as the tenant's right to damages by

the taking of part of the property is concerned; but a mere expectation of renewal based on evidence that the landlord and tenant were mutually satisfied and were likely to renew does not create an interest in land, and cannot be considered in determining the value of a leasehold estate." 10 R. C. L. 135, sec. 119.

In the following cases cited by plaintiff: *Hercey v. Board of Chosen Freeholders,* 99 N. J. Eq. 525, 133 Atl. 872; *Iron City Automobile Co. v. City of Pittsburgh,* 253 Pa. St. 478, 98 Atl. 679; *Hoffman Wall Paper Co., Inc., v. City of Hartford,* 114 Conn. 531, 159 Atl. 346; *State v. Northern P. R. Co.,* 88 Mont. 529, 295 Pac. 257, the tenant was granted a fixed term, with the right reserved to the landlord to terminate the lease before the expiration of the term. The fixed term constituted an estate or interest in the real estate. The landlord's option to terminate the tenancy did not operate to divest such interest until exercised. The tenant was the owner for a term of years, subject to a condition subsequent. The aforementioned cases are, therefore, distinguishable from the case at bar.

The cases of *In the Matter of William and Anthony Streets,* 19 Wend. (N. Y.) 678, and *North P. R. Co. v. Davis & Leeds,* 26 Pa. St. 238, cited by plaintiff, involved terms of leases which were, by express covenant, subject to renewal at fixed periods at the lessee's option. In such cases the lessee's right of renewal was considered in determining the value of the unexpired term, and the cases are distinguished from those in which the lessee does not have a legal option to such renewal.

Plaintiff cites *Mayor and City Council of Baltimore v. Rice,* 73 Md. 307, 21 Atl. 181, wherein one Rice was the owner of a brick-yard, constructed on leased premises. It was proposed to enter a street directly through the brick-yard, and Rice testified that if the street should go through the yard would be worth nothing. The agent of the owner testified that it had been his intention to renew the tenancy of Rice, if the street had not been opened, due to the value of Rice's investment and business, and the desire of the

owner to have Rice as a tenant. Plaintiff contends that the testimony of the owner's agent is parallel with that of Mr. Cannon and the representative of the railroad company who negotiated the lease in the instant case. The authority delegated to the superintendent was limited to that delegated to the vice-president and general manager, and did not extend beyond the written provisions of the lease. A railroad lease, extending beyond five years, had to be separately authorized by the president of the railroad. The lease in question was written as authorized, and the written lease expressed the agreement of the parties at the time the lease was made.

The trial court did not err in excluding the evidence offered. The lease was for a fixed period of time, and damage to the leasehold does not extend beyond May 31, 1941.

Plaintiff contends: "Where business property is damaged as the result of a public improvement, future profits, based upon past profits, are a pertinent inquiry in determining the value of the business property damaged,"—citing many cases.

Plaintiff sets out in detail in its brief the case of *City of Omaha v. McGavock,* 47 Neb. 313, 66 N. W. 415, wherein specific testimony was received as to a definite amount in the loss of business, namely, $3,000 a year, and that business had fallen off from a third to a fourth, due to the erection of a viaduct by the city. The writer of the opinion did not fully agree with his colleagues on the admissibility of such evidence. The foregoing case is cited and followed in *Gillespie v. City of South Omaha, supra,* however, not to the extent of permitting the showing of profits (see 79 Neb. 445), and attention is called to the conclusion in the opinion in *City of Omaha v. McGavock, supra,* which is significant, for the reason that the evidence discloses damages in a much larger amount than was returned, and, therefore, such evidence was ample to support the finding of the jury. This conclusion in the opinion indicates that the amount of damages returned was of such amount that to return the case for a retrial, because of evidence showing profits, if erroneous, would not be justified.

"Nor can the profits of a business be shown for the purpose of proving the value of the property. The profits of a business do not tend to prove the value of the property upon which it is conducted. The profits of a business depend upon its extent and character and the manner in which it is conducted. One man will get rich while another will become bankrupt in conducting the same business upon the same property. It is proper, however, to show how the taking will interfere with the use of the property, either for the purpose to which it is actually devoted or for any purpose to which it is adapted." 2 Lewis, Eminent Domain (3d ed.) 1271, sec. 727. See, also, 2 Nichols, Eminent Domain (2d ed.) 1171, sec. 446.

"Accordingly, it is well settled that when land occupied for business purposes is taken by eminent domain, anticipated profits from the continued carrying on of the business in its established location cannot be considered in estimating the damages." 10 R. C. L. 145, sec. 127, and cases cited under note 20.

While the Nebraska cases disclose that every element of annoyance and disturbance resulting from the improvement which would influence an intending purchaser's estimate of the market value of such property may be shown, it does not include, within the meaning of the rule, profits, as contended for by plaintiff.

Plaintiff cites the case of *Des Moines Wet Wash Laundry v. City of Des Moines,* 197 Ia. 1082, 198 N. W. 486, 34 A. L. R. 1517. In that case there was no attempt to recover profits. The opinion stated that this item would be too remote and speculative. The courts quite universally so hold.

In the case of *Gledhill v. State,* 123 Neb. 726, 243 N. W. 909, the value of a crop lease was the measure of recovery, and the opinion is so worded that the rule does not extend beyond the facts in the particular case.

In *Stanwood v. City of Omaha,* 38 Neb. 552, 57 N. W. 287, evidence was admitted as to the depreciated amount of rents before and after the construction of a viaduct, and this was given in round figures and involved purely rental

property, where the decrease could be shown with a degree of accuracy.

We adhere to the rule universally followed by the courts that profits in the future, based upon profits as shown by the past, are speculative and conjectural and not admissible as evidence of damage to a leasehold, and that profits, gross and net, do not go to the value of the leasehold under the Nebraska rule in showing diminution of business. We conclude that other citation of authority in this respect is not necessary.

Plaintiff contends that the court erred in denying it the right to show the volume of business conducted on the leased premises. It endeavored to prove the volume of business by showing the number of gallons of gasoline, oils and kindred products handled, and offered like proof with reference to the poultry, egg, cream and milk business carried on by plaintiff. The court permitted testimony as to the economies and saving, but restricted testimony as to the volume of business.

While stated figures in a business, such as plaintiff's, with fluctuating prices from time to time, would not be a proper basis of damage, certainly the amount of business by volume, that is, the amount of produce, oils, poultry, eggs, etc., handled and the amount thereof handled since the construction of the viaduct would be competent.

The value of a leasehold must be determined by consideration of the uses to which the property is adapted. All circumstances naturally affecting this value are open to consideration. Every legitimate use to which it may be applied may be considered. The market value of the unexpired term should be taken into consideration, also the situation, condition and use made, or that may be made, of the premises, and the nature and prosperity of the business carried on there, if it affects the value of the lease. *Bales v. Wichita M. V. R. Co.*, 92 Kan. 771, 141 Pac. 1009, L. R. A. 1916C, 1090. As to the extent of proof of elements, not as independent items of damage, but as it affects the market value, see *Pegler v. Hyde Park*, 176 Mass. 101, 57 N. E. 327.

The volume of business done on any given leasehold has a direct relation to the value of the leasehold, as volume is directly connected with the success of the business, and diminution of business means decrease in volume. See *Gillespie v. City of South Omaha, supra; City of Omaha v. Flood,* 57 Neb. 124, 77 N. W. 379; *Chicago, R. I. & P. R. Co. v. O'Neill,* 58 Neb. 239, 78 N. W. 521; *Des Moines Wet Wash Laundry v. City of Des Moines, supra.* And in *Lowe v. City of Omaha,* 33 Neb. 587, 50 N. W. 760, it was held: "The market value is not what the property is worth solely for the purpose for which it is devoted, but the highest price it will bring for any and all uses to which it is adapted, and for which it is available."

We believe that the court erred in excluding testimony as to volume of business and restricting proof thereof.

Plaintiff further contends that the court erred in excluding testimony of expert witnesses who were acquainted with the nature, kind and volume of business transacted by the plaintiff. The admissibility of evidence of experts is left largely to the sound discretion of the trial court, and it will not, ordinarily, be disturbed unless it is found that the court abused its discretion. 22 C. J. 526. However, it would not be necessary that a witness be acquainted with real estate values of the city in order to qualify as an expert. The value of the leasehold is the question at issue in this case. The leasehold stood upon a tract of ground on the Missouri Pacific right of way, with a nominal rental. The location had a distinct advantage, due to the nature of the business. Many track-side industries are placed along a railroad's right of way under similar and like leases, and businesses of a like or similar nature to that of plaintiff are also on leased right of ways. Witnesses, acquainted with the nature of the business, volume of business done, advantages of track-side facilities for the business, and who have a knowledge of the business by volume transacted by the plaintiff, would be competent to testify, and should not be restricted in their testimony on such facts, subject to proper qualifications to so testify and proper foundation

laid for such testimony. See *Cochrane v. Commonwealth,* 175 Mass. 299, 56 N. E. 610; *Consolidated Gas Co. v. Baltimore City,* 105 Md. 43, 65 Atl. 628; *Louisville & N. R. Co. v. Western Union Telegraph Co.,* 249 Fed. 385.

The trial court erred in restricting this testimony; such testimony goes to the diminution of the value of the leasehold for the unexpired term of the lease.

Plaintiff objects to certain instructions given by the trial court which we deem not necessary to be discussed here, for the reason that, on a retrial of this case, under the principles of law as announced in this opinion, certain instructions will be subject to modification or change, and others will be given as the proof develops.

For the reasons given herein, the judgment of the district court is reversed, and the cause remanded for further proceedings.

REVERSED.