ANEITA F. RUEHLE, APPELLANT, v. EDWARD W. RUEHLE ET AL., APPELLEES.

74 N. W. 2d 689

Filed February 3, 1956. No. 33629.

*Charles Ledwith,* for appellant.

*Towle, Young & Scheaff* and *Thomas J. McManus,* for appellees.

Heard before SIMMONS, C. J., CARTER, YEAGER, WENKE, and BOSLAUGH, JJ., and KOKJER, District Judge.

MESSMORE, J.

This is an action brought in the district court for Lancaster County by Edward W. Ruehle, the defendant in a divorce action brought by Aneita F. Ruehle, plaintiff therein, for the purpose of obtaining a judgment for child support rendered against him in the divorce action adjudged satisfied and released of record. The plaintiff in the divorce action, by cross-petition in the instant case, prayed for an accounting and that a lien be created on certain real estate held in the name of the defendant Grace Ruehle, the present wife of Edward W. Ruehle, for amounts payable as child support.

The record discloses that Aneita F. Ruehle obtained a decree of divorce from Edward W. Ruehle on May 18, 1939, and was awarded custody of their daughter Jo Ann, then 8 years of age, until further order of the court, and the sum of $40 a month for child support to be paid to the clerk of the district court for Lancaster County on the first day of each month to be delivered to Aneita F. Ruehle upon her receipt therefor. On November 29, 1939, the husband, Edward W. Ruehle, filed a supplemental petition for modification of the original decree of divorce with reference to child support. To this petition Aneita F. Ruehle filed an answer and cross-petition requesting an increase in child support to $75 a month. A decree was entered by the trial court on February 15, 1940, finding that the defendant Edward W. Ruehle should pay child support in the amount of $50 a month commencing March 1, 1940, payable to the clerk of the district court until further order of the court.

By stipulation of the parties filed November 30, 1940, it appears that there were delinquent child support payments in the amount of $229.84 for which Aneita F. Ruehle agreed to accept $104.92 in full payment. In addition, the defendant was to pay costs in the amount of $38.79 and attorney's fees in the amount of $63, and the amount of $15 on the first day of December 1940 and on the 15th day of December 1940, and on the same dates each month thereafter. In consideration of such payments, Aneita F. Ruehle was not to issue execution, garnishment, or other process against the defendant Edward W. Ruehle as long as the payments continued. On March 1, 1941, if all the payments had been promptly paid, Aneita F. Ruehle was to release her judgment for child support for the amounts accrued, and in the event payments were continued then at the expiration of each 3 months thereafter. The stipulation provided further that in the event Edward W. Ruehle failed to make any payments as therein provided, the plaintiff Aneita F. Ruehle, at her election, might terminate the agreement forthwith and take such steps as she desired to collect child support in the amount of $50 a month for such period of time as she had last receipted for in full. The stipulation provided further: "It is not the intention of the parties to modify the decree of this court as it now stands, but that said decree shall remain in full force and effect, subject, however to this agreement between the parties." The stipulation was dated November 28, 1940.

On January 8, 1953, the defendant Edward W. Ruehle filed a petition in the district court. This petition was later amended. We make reference to the amended petition containing the following allegations in substance. The petition set forth the date of the decree of divorce, the awarding of custody of the minor child, child support and the manner in which the same should be paid, and alleged that the child support payments were made directly to Aneita F. Ruehle or to the clerk of

the district court until September 1948, at which time Edward W. Ruehle had an oral conference with Aneita F. Ruehle about sending their daughter to Wesleyan University; that it was orally agreed by and between Aneita F. Ruehle and Edward W. Ruehle that in lieu of child support payments the defendant Edward W. Ruehle would pay all of the expenses of the daughter while she attended Wesleyan University; that Edward W. Ruehle did assume and pay such expenses which were far in excess of the monthly child support payments; that such payments were in lieu of child support payments; and that he paid all the tuition, board and room, and other expenses of their daughter Jo Ann from October 1948 until August 17, 1949. The amended petition further alleged that on or about August 1, 1949, the daughter Jo Ann decided to enter nurses training at Bryan Memorial Hospital, and it was agreed by and between Aneita F. Ruehle and Edward W. Ruehle that the latter would pay the entry expense of $100 and any additional expenses in connection with Jo Ann's training in lieu of child support that should have been paid to the clerk of the district court; that it was the understanding and belief of Edward W. Ruehle that Aneita F. Ruehle would accept the aforesaid payments at Wesleyan University and Bryan Memorial Hospital and all expenses of the daughter in connection therewith as full payment of child support as it became due, and that Aneita F. Ruehle would release and discharge Edward W. Ruehle and the judgment against him; that Jo Ann, the daughter of the parties, attained her majority on August 17, 1951; and that Edward W. Ruehle relied on the oral agreement with Aneita F. Ruehle and made all the payments as provided for by the oral agreement believing that Aneita F. Ruehle would credit him with such payments and release the judgment for child support against him, which Aneita F. Ruehle failed and refused to do.

The answer of Aneita F. Ruehle to the amended petition denied that Edward F. Ruehle ever made any child

support payments directly to her other than to the clerk of the district court with her consent; denied the oral agreement as pleaded in the amended petition; and admitted that on August 1, 1949, Jo Ann decided to enter nurses training at Bryan Memorial Hospital, and that on August 17, 1951, Jo Ann reached her majority and became self-supporting.

In the cross-petition Aneita F. Ruehle set forth the modification of the decree as heretofore mentioned, and the stipulation, and pleaded that she never released her judgment for child support on March 1, 1941, or any other date; that the stipulation was void and of no effect; pleaded the installments of child support and interest thereon due; that the legal relations of the parties had been affected by a conveyance of real estate to the present wife of Edward W. Ruehle dated June 8, 1951; that the construction of the deed was necessary to determine the rights of the parties; that an actual controversy existed and justiciable issues were presented, and a declaratory judgment on the issues would terminate the controversy; pleaded the purchase price of the property paid by Edward W. Ruehle, the mortgage thereon, and other facts with reference thereto; that a trust was created; and that Aneita F. Ruehle was without an adequate remedy at law. The prayer was for dismissal of Edward W. Ruehle's amended petition and for an accounting, interest, and a declaration of the rights and status and other legal relations of the parties as affected by the conveyance to Edward W. Ruehle's present wife of the real estate as described in the cross-petition, and to declare and adjudge that a trust of such real estate had resulted and was subject to a lien.

The trial court entered a decree on April 21, 1954, finding that the stipulation entered into between the parties on November 28, 1940, suspended the right to enforce the judgment as long as there was no breach of the agreement; that the oral agreement between Edward W. Ruehle and Aneita F. Ruehle that said defendant

Edward W. Ruehle, in lieu of payments to the clerk of the district court for child support, would take over the cost of providing an education for the daughter Jo Ann Ruehle was supported by ample consideration, and that there was complete accord and satisfaction; that Edward W. Ruehle was entitled to a release and satisfaction of the judgment for child support; and that the cause of action against the present wife of Edward W. Ruehle be dismissed.

Aneita F. Ruehle, the plaintiff, filed a motion for new trial which was overruled. Thereafter she perfected appeal to this court.

Edward W. Ruehle testified that he made payments to the clerk of the district court which approximated $15 each 2 weeks from December 1, 1940, to June 1949; that the daughter Jo Ann lived with her mother; that in the fall of 1948 Jo Ann changed her residence by entering Wesleyan University and moving onto the campus in Johnson Hall, girls' dormitory at University Place, on November 17, 1948, and from that time on did not live with her mother; that on October 12, 1948, prior to the time Jo Ann entered Wesleyan University, he had a conversation with Jo Ann and her mother relative to Jo Ann moving from the mother's home to the school; that school had started at that time; that in the conversation had with Aneita F. Ruehle he asked her if Jo Ann had talked to her about going to Wesleyan to live in Johnson Hall, to which she replied that Jo Ann had; that he then asked her if it was agreeable for Jo Ann to move out, and received a reply that if it was Jo Ann's wish it was agreeable; and that he then asked her if Jo Ann had discussed the release of child support payments since he could not afford to pay child support in addition to paying all the expenses while Jo Ann attended the university and she replied that Jo Ann had. He further testified that he paid all of Jo Ann's expenses, tuition, board, room, sorority dues, and other items of expense, and the agreement was that he was to continue to pay

child support payments into the district court until such time as it was determined whether or not Jo Ann would continue in school and be successful in her endeavors; that he paid the expenses of Jo Ann at the university and also $30 a month to the clerk of the district court until June 1949, with the understanding that Aneita F. Ruehle was to return the money paid into the clerk's office during such period of time that Jo Ann attended the university; and that Aneita F. Ruehle returned the payments in cash by giving the same to Jo Ann with instructions to return the money to her father. He further testified that in 1949 he stopped this method of making the payments upon the suggestion of Aneita F. Ruehle that it was a nuisance. During the summer of 1947 and 1948 Jo Ann worked at the Lincoln General Hospital as a nurses aid. In the fall of 1949 she entered Bryan Memorial Hospital to become a registered nurse. She continued her employment there until August 17, 1952. She was graduated from Wesleyan University in 1953. During the time she was taking training at Bryan Memorial Hospital he paid her expenses. Jo Ann subsequently married and moved to Los Angeles.

Jo Ann, by deposition, corroborated the testimony of her father that he paid all of her expenses for tuition, room and board at the university, also the child support as testified to by him, and that she was graduated from the university and became a registered nurse and self-supporting.

Aneita F. Ruehle did not testify. There is no contradiction of the testimony of Edward W. Ruehle and Jo Ann.

We hereinafter refer to the plaintiff, Aneita F. Ruehle, as appellant, and the defendant, Edward W. Ruehle, as the appellee.

The appellant sets forth many assignments of error. We consider the following important to a determination of this appeal: The trial court erred in finding there was a complete accord and satisfaction between the

appellant and the appellee, and in failing to grant the relief prayed for in the appellant's cross-petition; and the trial court erred in not finding that the written stipulation between the appellant and appellee dated November 28, 1940, was void and unenforceable for lack of consideration moving to the appellant.

Section 42-312, R. R. S. 1943, provides as follows: "If the circumstances of the parties shall change, or it shall be to the best interests of the children, the court may afterwards from time to time on its own motion or on the petition of either parent revise or alter, to any extent, the decree so far as it concerns the care, custody and maintenance of the children or any of them."

Divorce and its incidents are matters of public concern over which the Legislature has authority. What policies to adopt concerning its regulation are for it to decide and are not for the courts. See Harrington v. Grieser, 154 Neb. 685, 48 N. W. 2d 753.

The above-cited statute specifically provides that the court in a divorce action retains jurisdiction of the subject matter and the parties for the enforcement or modification of a judgment for maintenance of children and prescribes the method by which a decree for child support may be modified. See Miller v. Miller, 153 Neb. 890, 46 N. W. 2d 618.

Where a divorce decree provides for the payment of stipulated sums monthly for the support of a minor child or children, contingent only upon a subsequent order of the court, such payments become vested in the payee as they accrue. The courts are without authority to reduce the amounts of such accrued payments. See, Wassung v. Wassung, 136 Neb. 440, 286 N. W. 340; Clark v. Clark, 139 Neb. 446, 297 N. W. 661.

The decree of a district court in a divorce action, insofar as a minor child is concerned, is never final in the sense that it cannot be changed but is subject to revision at any time in the light of changing circumstances. The district court has a continuing power, after decree

of divorce, alimony, and child support has been granted, to review and revise the provisions of child support at its subsequent terms by petition of either of the parties. An application to modify the terms of a decree of divorce is not an independent proceeding. It is not the commencement of an action. It is simply a proceeding supplementary or auxiliary to an action in which certain matters theretofore determined are by the very terms of the statute subject to modification. See Bize v. Bize, 154 Neb. 520, 48 N. W. 2d 649.

The stipulation, as appears in the instant case, in no sense modified the decree with reference to the child support, and it was so agreed by the parties as the stipulation discloses.

Accord and satisfaction is defined in Crilly v. Ruyle, 87 Neb. 367, 127 N. W. 251, as follows: "An accord and satisfaction is predicated upon an agreement between the parties based upon a consideration and fully executed on the part of the defendant, whereby the plaintiff's cause of action is satisfied or discharged."

The appellee contends that an accord and satisfaction prevailed in the instant case when the oral agreement between the appellant and the appellee was made on October 12, 1948, and that according to this agreement the appellant agreed to release the judgment against the appellee for all child support that might have accrued and become due under the decree. We are not in accord with the appellee's contention in this respect. We are in accord that there is a complete accord and satisfaction of the child support that would have accrued or become due from and after October 12, 1948, by reason of an agreement that was far more beneficial to the interests of the daughter Jo Ann. She had the benefit of an education and nurses training, and acquitted herself with honor, all through the efforts of the appellee by agreement with the appellant.

We conclude that there should be an accounting as to the child support payments which had accrued and were

due up to October 12, 1948, with interest thereon at the legal rate, and that all credits should be given to the appellee for payments made by him for child support. The cause is remanded to the trial court for determination of the amount of child support due on this phase of the case.

The appellant, as shown by the pleadings heretofore stated in part, contends that the real estate described therein should be impressed with a lien for the payment of child support that might be found owing by the appellee. The record discloses the title to this property to be in the name of Grace Ruehle, the present wife of the appellee. We find nothing in the record to support the contention of appellant and, under the circumstances as presented in the record, there is no reason to impress a lien upon this real estate or subject any part of it to payments of child support that may be owing by the appellee.

The appellant contends she is entitled to an allowance for attorney's fees to be taxed as costs on the ground that this proceeding is a continuation of the divorce suit and one of its incidents.

We have held that under section 42-312, R. R. S. 1943, attorney's fees may be allowed until the subject matter is finally settled and determined. See Miller v. Miller, *supra*. It is true, the law permits an allowance of attorney's fees in a case such as this, but does not require it. Under the facts and circumstances as presented in the instant case, we believe that there should be no allowance of attorney's fees to be taxed as costs in behalf of the appellant, and that the appellant be required to pay her own costs and attorney's fees.

For the reasons given in this opinion, the judgment of the district court is reversed and the cause remanded with directions to modify the decree in accordance with the opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

MESSMORE, J., participating on briefs.

CARTER, J., dissenting.

I am not in accord with the decision of the majority. The factual situation as stated by the majority is accepted as correct. However, for the purposes of this dissent I shall restate the conclusions to be drawn from the record.

Plaintiff and defendant were divorced on May 18, 1939. Plaintiff was granted the custody of Jo Ann Ruehle, then 8 years of age, and was awarded the sum of $40 a month for her support. On February 15, 1940, the trial court on proper application increased the child support to $50 per month. On November 28, 1940, there were delinquent child support payments in the amount of $229.84. In order to secure an amicable adjustment of the delinquent payments and the payments to be made by the defendant in the future within his ability to pay, a stipulation was entered into between the parties on November 28, 1940, which becomes of primary importance in the disposition of this case. The record clearly shows that the stipulation was openly arrived at without any overreaching by either of the parties. In fact, the stipulation was prepared by the attorney for one of the parties, and the attorney of record of each party appears to have signed the stipulation as witnesses to the signatures of their respective clients.

The body of the stipulation is in three paragraphs in which the parties stipulate as follows:

"1. That there is now due to plaintiff delinquent child support in the sum of $229.84, unpaid court costs in the sum of $38.79, and a balance due on attorney fees heretofore taxed against the defendant of $63.00, and that plaintiff shall accept as full payment of said child support the sum of $104.92, provided said court costs and attorney fees as above set out are paid in full.

"2. It is further stipulated that in event the defendant pays the sum of $15.00 as child support on the 1st day of December, 1940, and $15.00 on the 15th day of

December, 1940, and like amounts on the 1st and 15th days of each month thereafter, that plaintiff will not issue execution, garnishment or other process against the defendant so long as said payments continue, and that on the 1st day of March, 1941, in event all of said payments herein provided for have been made promptly at the times and in the amounts set out, plaintiff will release her judgment for child support in full to March 1, 1941, and in event said payments are continued as herein provided for, plaintiff will release her judgment for child support for the amounts accrued, at the expiration of each three months thereafter; provided further, that in the event that defendant fails to make any payment herein provided for at the time or in the amount required, plaintiff at her election may terminate this agreement forthwith and take such steps as she desires to collect child support at $50.00 per month from such period of time as she has last receipted for in full.

"3. It is not the intention of the parties to modify the decree of this court as it now stands, but that said decree shall remain in full force and effect, subject, however, to this agreement between the parties."

On August 17, 1951, the daughter, Jo Ann, attained her majority. On January 8, 1953, the defendant filed a petition in the action seeking a release of the judgment for child support after the plaintiff refused to voluntarily release it. The evidence shows that all child support payments agreed upon in the stipulation were made to plaintiff or to the clerk of the district court until September 1948. At that time plaintiff and defendant orally agreed that in lieu of child support payments, defendant would pay all expenses of Jo Ann while she took nurses training at Bryan Memorial Hospital. In the fall of 1948 Jo Ann desired to enter Wesleyan University and it was thereupon agreed by the plaintiff and defendant that defendant would pay all the expenses in lieu of child support payments. The evidence shows that until June 1949, defendant paid $30 per month into

the office of the clerk of the district court and that plaintiff returned such payments to the defendant, in accordance with the agreements made, until such method of handling was discontinued at the instance of the plaintiff because, as she said, it was just a nuisance. The foregoing facts were testified to by defendant and the daughter, Jo Ann. The plaintiff did not deny them. In fact, she did not even testify at the trial. The evidence stands admitted by the record.

I concur in the rules cited in the cases appearing in the majority opinion. I submit, however, that they have no application to a case such as we have before us. The facts established by the undisputed evidence show that plaintiff is equitably estopped from enforcing her judgment for child support. It seems necessary to point out that the attempt to enforce the judgment came more than 12 years after the stipulation was made, and almost a year and a half after the daughter, Jo Ann, had attained her majority, and after she had married and established a home in California. The support of a minor child is not therefore involved in the present litigation. It is not disputed that defendant complied meticulously with the written stipulation made by the parties and all the oral agreements that were subsequently entered into. No attempt was ever made to dispute these facts. The only breach of the written stipulation was by the plaintiff. She agreed in writing that if payments of child support were promptly made in accordance with the stipulation, she would at the end of each 3 months release the judgment as to payments accruing during that period. She neglected to do so, and, when called upon to do it immediately prior to the commencement of this suit in the manner to which she had agreed, she refused to do so. She now pleads her own breach of her agreement as a basis for a further recovery against the defendant who, it is admitted, kept his part of the agreement exactly as it was made. At no time did the plaintiff elect to terminate the agreement

in the manner in which the stipulation provided, for the reason, no doubt, that there had been no violation of its provisions which, by its terms, authorized her to do so. Her position in this litigation is: After receiving all the benefits of the stipulation and the agreements contained therein; after the daughter, Jo Ann, had been properly supported and educated by the defendant in accordance with its terms, and more; after she had been relieved of the care and support of Jo Ann; after she had violated both the terms and spirit of the agreement by refusing to release the judgment during the periods she was required by the agreement to do; she now has the effrontery to petition a court of equity to adjudge that she is entitled to a large sum of money, with interest, resulting from her own breach of contract and her own bad faith. After all, the only purpose of a child support order is to require the father to perform his duty to society and to his child with reference to her support.

It is not my position that the written stipulation of the parties had the effect of modifying the judgment. The stipulation of the parties itself provides otherwise. Nor do I contend that there has been or has not been an accord and satisfaction of the judgment. There is no need to discuss those matters. My position is that plaintiff is equitably estopped from enforcing the judgment, however valid it may be, by her own conduct.

In the early case of Ricketts v. Scothorn, 57 Neb. 51, 77 N. W. 365, 73 Am. S. R. 491, 42 L. R. A. 794, this court said: "An estoppel in pais is defined to be 'a right arising from acts, admissions, or conduct which have induced a change of position in accordance with the real or apparent intention of the party against whom they are alleged.' Mr. Pomeroy has formulated the following definition: 'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed,

either of property, or contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy.' (2 Pomeroy, Equity Jurisprudence 804.)" In City of Grand Island v. Willis, 142 Neb. 686, 7 N. W. 2d 457, this court said: "The petition pleads estoppel. With reference thereto it is said in 10 R. C. L. 688, sec. 19, that, 'While the attempted definitions of such an estoppel are numerous, few of them can be considered satisfactory, for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances.' And in 31 C. J. S. 193, sec. 3, it is said: 'It is commonly stated in many decisions that estoppels are odious and are not favored in law because they exclude the truth. Nevertheless, the wisdom and justice of the principle of estoppel, especially estoppel in pais, * * * are generally recognized, the view being founded on principles of equity, morality, and justice, and in accord with good conscience, honesty, and reason; and, as such, the doctrine subserves its true purpose as a plain, practical, fair and necessary rule of law.' * * * 'It is based on the grounds of public policy and good faith, and is interposed to prevent injury, fraud, injustice, and inequitable consequences by denying to a person the right to repudiate his acts, admissions, or representations, when they have been relied on by persons to whom they were directed and whose conduct they were intended to and did influence.' 31 C. J. S. 248, sec. 63. * * * As previously stated, and as shown by the authorities, the factual situation in each and every case and the circumstances surrounding it are so distinctively different that, out of numerous definitions, not a single one would apply in all cases wherein the question of

estoppel is raised, but, as pointed out, where the circumstances are such that a grave injustice or inequity or fraud would be perpetrated by failing to apply the doctrine, as appears in the instant case, then it may be applied."

It might be urged that an estoppel was not pleaded in the present case. The rule is: "Ordinarily an estoppel or waiver must be pleaded by the party invoking it, but where the facts showing an estoppel or waiver are within the issues made by the pleadings and the evidence thereof is admissible for any purpose, it is not necessary that the estoppel or waiver shall be specially pleaded." Ross v. First American Ins. Co., 125 Neb. 329, 250 N. W. 75. The facts establishing an equitable estoppel are pleaded and conclusively established in the present case.

The holding of the majority appears to rest largely on the theory that public policy in relation to the protection and support of minor children in divorce actions requires an adherence to the hard and fast rule announced in Miller v. Miller, 153 Neb. 890, 46 N. W. 2d 618; Wassung v. Wassung, 136 Neb. 440, 286 N. W. 340; Clark v. Clark, 139 Neb. 446, 297 N. W. 661; and similar cases. As a general proposition as it arises in ordinary cases I concur in that conclusion. But an estoppel in pais is dependent upon the circumstances in each particular case. And those circumstances must be considered as of the time that the estoppel is alleged to arise. So considered, there is no question of the support of a minor child presently involved. The fact that the rights of a minor child were once involved does not mean, necessarily, that the public policy regarding their support is forever present. The time can well arise when the public policy which supports an estoppel in pais can be superior to or the only public policy involved. While this court does not appear to have passed on this question, courts of other jurisdictions have done so.

In Koenig v. Koenig (Mo. App.), 191 S. W. 2d 269,

the court in a similar case said: "Plaintiff had a judgment against defendant for $15 per month for support of her two children; there was $195 due on the judgment, when plaintiff and defendant agreed that upon payment to plaintiff of $750, she would release defendant from further liability. Plaintiff accepted the payment of the $750 and for over nine years made no complaint of any fraud or duress in the procurement of the agreement and the satisfaction of the judgment. The agreement was entered into and carried into effect with deliberation and upon advice of able counsel. * * * And while it is true that the defendant could not, by contract with plaintiff, deprive the children of their right to support from him in case the plaintiff should fail to fulfill the contract by providing suitable support for the children, this does not mean that the contract as between plaintiff and defendant was not valid and binding. * * * There is no suggestion in the petition that the children are now in need of support or will be in the future, or that plaintiff has not been able to or has not complied with her agreement and properly supported them in the past." In Lochrie v. Lochrie, 232 Mo. App. 153, 108 S. W. 2d 178, it was said: "There can be no doubt that the satisfaction of the judgment was void as to the daughter, and a motion to set aside during minority or prior to her marriage would have been timely. * * * At the time the settlement was effected and the release was made, approximately $200 was paid to her (the wife) for the future maintenance of the minor, in addition to the delinquent installments and a fee of $25 to her attorney. This constituted sufficient consideration for the release of the judgment so far as plaintiff is concerned." In Schnierle v. Schnierle, 33 Ohio L. Ab. 212, 33 N. E. 2d 674, it was said: "If the plaintiff were awarded the judgment she seeks in this case, the judgment would belong to her and not to the child. The judgment would not require her to pay any sum recovered in support of the child. * * * In view of

the fact that the child is not interested in the judgment sought to be obtained in this case no good reason has been advanced why this agreement should not be recognized and given effect by the court." See, also, Dutcher v. Dutcher, 103 Kan. 645, 175 P. 975; Bidinger v. Bidinger, 89 Ohio App. 274, 101 N. E. 2d 241.

Proceedings to enforce an order for the payment of money for the support of minor children are subject to any valid defense against the required payment. 27 C. J. S., Divorce, § 321, p. 1227. Laches has been held to be a defense. Matthews v. Wilson, 31 Ind. App. 90, 67 N. E. 280. Acquiescence on the part of a wife in the husband's paying less than the amounts stipulated by the court has been generally held to constitute a defense to an action or proceeding for the full amount stipulated in the court order. McKee v. McKee, 154 Kan. 340, 118 P. 2d 544, 137 A. L. R. 880; Parker v. Parker, 189 App. Div. 603, 179 N. Y. S. 51; Caprio v. Caprio, 169 Misc. 568, 8 N. Y. S. 2d 205; Glaze v. Strength, 186 Ga. 613, 198 S. E. 721. The holdings of the latter cases can be summarized in the language of the Kansas court in McKee v. McKee, *supra,* wherein it was said: "A fair construction of appellee's testimony is that she acquiesced — however unhappily — in the reduction to $50. That she did so is confirmed by the fact that every month for over nineteen years she took the $50, made no objection to appellant, and took no steps of any sort to enforce payment of $60. She waited until after the daughter was of age and no longer required or asked any support from either of her parents and had signed the written release.

"While lapse of time alone will not ordinarily support a defense of laches, it has been held sufficient to make the doctrine applicable in cases where it would be clearly inequitable to permit the enforcement of bare legal rights (19 Am. Jur. 352, § 508), or where the delay in asserting rights has been wholly unreasonable. (21 C. J. 220, § 218). However, we have here much

more than mere lapse of time. We have acquiescence on the part of appellee — an important factor in determining whether there has been such laches as will bar recovery. (21 C. J. 224, 225, § 219; 10 R. C. L. 397, 398, § 144, note 17.) We have the affirmative acts of appellee in accepting the monthly payments, without complaint, through the years. If appellant believed, as he asserts, that his action in reducing the payments was with the consent of the court, then her conduct let him rest in that belief. If we assume that he became aware that no formal court order had been entered, then it must be said that her acts and conduct lulled him into inaction in the matter of securing, if possible, such a court order. Can it fairly be said that appellee's actions did not result in disadvantage to the appellant as far as enforcement of the alleged deficiencies is concerned? We think not. In the first place, payment of the lump sum now demanded is quite a different thing from payment of $10 a month. Furthermore, in the light of all the circumstances, it is obvious that appellant's situation as it relates to possible modification of the order has been altered to his detriment by appellee's acquiescence and long silence. The doctrine of laches being equitable in character, all facts and surrounding circumstances are to be considered in determining its applicability. We think it would be clearly inequitable, under the instant facts, to permit any recovery by appellee." See Miller v. Miller, *supra,* wherein this court recognized the application of such equitable principles in cases similar to the one at bar. See, also, Schroeder v. Ely, 161 Neb. 252, 73 N. W. 2d 165.

Whether the defense invoked, under the facts of a particular case, be laches, acquiescence, lapse of time, or estoppel, it is available in a case of this kind. All the principles of equity are not thrown to the four winds simply because a minor child was once involved. Equitable principles were not evolved to prevent injury, fraud, injustice, and inequitable consequences by denying to

a person the right to repudiate his acts, agreements, and representations in one case, and to permit him to do it in another. It is a general principle to be applied in all cases when the circumstances warrant its application.

I quite agree that if the child were a minor in need of support, any agreement made by the plaintiff and defendant depriving the child of adequate support would be void as to the child, and could properly be set aside in accordance with the public policy of the state.

In the case at bar the minor child has reached her majority, and has in effect disclaimed any interest in the litigation. An allowance made by the court in addition to what plaintiff has already received would be a judgment for her and not for the child. Plaintiff does not claim that she has expended money of her own in support of the child for which she has not been reimbursed. She merely sees an opportunity, by disavowing her agreement which was relied on in good faith by the defendant, to relieve the defendant of a large sum of money. Equity does not permit one to repudiate his agreements made in good faith to accomplish such a dishonest scheme producing such inequitable consequences. The minor child having reached her majority, there is no public policy regarding this child support decree behind which this plaintiff may hide. She is subject to the same rules governing equitable estoppel as is any other person who desires a dishonest change of position to accomplish selfish motives.

It is not questioned in this record, in fact it is readily admitted, that the defendant supported Jo Ann, paid for her education and training, and performed the agreements made with the plaintiff to the latter's complete satisfaction. The daughter, Jo Ann, now an adult person, so testifies. The only breach of the stipulation was the failure and refusal of plaintiff to discharge the decree in the manner provided. Equity will invoke the rule that it will consider done that which should have been done. If this rule is applied, plaintiff has no claim

to relief. How can it be said that the plaintiff, after entering into the agreement and inducing the defendant to rely upon it to his injury, may now avoid the effects of her own breach and insist upon the enforcement of a legal right based thereon? A recognition of such right finds no support in the principles of equity, morality, and justice, and are not in accord with good conscience, honesty, and reason. To so hold is to debase the principle of equitable estoppel which should be interposed to prevent injury, fraud, injustice, and inequitable consequences by denying to the plaintiff the right to repudiate her agreements, stipulations, and representations when they have been relied upon as she intended them to be. I submit that, under all the facts and circumstances admitted to be true in this case, it would be grossly inequitable not to apply the principle of equitable estoppel. Its application requires an affirmance of the district court's order denying any relief to the plaintiff and a granting of the application of the defendant for a satisfaction of the child support judgment.

I am authorized to state that Simmons, C. J., concurs in the foregoing portion of this dissent.

There is a further reason why this case must be affirmed. Article V, section 2, Constitution of Nebraska, provides that district judges may sit as members of this court in four instances: (1) When the court sits in two divisions of five judges in each division, (2) when determining the constitutionality of a statute, (3) when hearing an appeal from a conviction of homicide, and (4) when reviewing a decision rendered by a division of the court.

The pertinent part of the constitutional provision provides: "* * * Whenever necessary for the prompt submission and determination of causes, the supreme court may appoint judges of the district court to act as associate judges of the supreme court, sufficient in number, with the judges of the supreme court, to constitute two divisions of the court of five judges in each division.

Whenever judges of the district court are so acting the court shall sit in two divisions, and four of the judges thereof shall be necessary to constitute a quorum. Judges of the district court so appointed shall serve during the pleasure of the court, and shall have all the powers of judges of the supreme court. The Chief Justice shall make assignments of judges to the divisions of the court, and shall preside over the division of which he is a member, and designate the presiding judge of the other division. The Judges of the supreme court, sitting without division, shall hear and determine all cases involving the constitutionality of a statute, and all appeals from conviction of homicide; and may review any decision rendered by a division of the court. In such cases, in the event of the disability or disqualification by interest or otherwise, of any of the judges of the supreme court, the court may appoint judges of the district court to sit temporarily as judges of the supreme court, sufficient to constitute a full court of seven judges. * * *." I submit that the present case is not one where the Constitution authorizes a district judge to participate.

The situation presented by this part of the dissent arose in the following manner. At the time the case was first argued, Chappell, J., considered himself disqualified, and the case was heard by the other six members of the court. A proposed opinion reversing the trial court's judgment was submitted by Messmore, J., which failed of adoption, and the case was reassigned to Simmons, C. J. The latter submitted a proposed opinion affirming the trial court's decision, which failed of adoption. The differences of opinion were such that a hopeless even division of the court was acknowledged by all participating members of the court.

The case was set down for reargument, and Kokjer, District Judge, was invited to sit with the court at the reargument. He did so, and in due time expressed the view that the proposed opinion by Messmore, J., correctly determined the issue. Prior to the taking of the

vote on a motion to adopt the proposed opinion of Messmore, J., the right of a district judge to vote on the matter was specifically challenged. In due time Simmons, C. J., concurred with Yeager, Messmore, and Wenke, JJ., that it was a case in which a district judge could participate as a member having "all the powers" of a judge of this court. The foregoing facts are the ones upon which I base my contention that a district judge is without power to participate in such a case as we presently have before us, that the appeal actually resulted in an equally divided court, and that, under such circumstances, an affirmance is required. If there is an equally divided court, the cases are legion that an affirmance is required. See 5 C. J. S., Appeal and Error, § 1844 (b), p. 1314, and cases cited in the note thereto.

I submit that the constitutional provision is plain and without the semblance of ambiguity. It is not subject to construction. The fact that certain practices have been indulged in by the court cannot change the plain meaning of the constitutional provision. The acquiescence of Simmons, C. J., in the views of Messmore, Yeager, and Wenke, JJ., that Kokjer, District Judge, is eligible to participate, can add nothing to such an apparent disregard of this pertinent provision of the fundamental law of our state.

I would be less than fair if I did not state that the indiscriminate use of district judges as members of this court has been discussed by members of the court from time to time in the past. A cursory search into past records does not reveal a single case that I have been able to find, although there may be some, where a situation such as we have before us has arisen, to wit: Where the regular members of the court, who were qualified to hear the case, *divided equally* on the merits, and where the vote of a district judge purported to *reverse* a judgment of the district court entered by a district judge who, in the eyes of the law, is of equal standing. But even if such case or cases exist, it could

not operate to change the plain language of the Constitution. I submit that these facts provide an appropriate case for the challenge to be made which questions the right of district judges to participate in cases of this kind. It raises purely a question of constitutional law, and nothing more. The issue cannot be decided on evidence of past practice over the years, by language used when this issue was not directly raised, or by some strained interpretation of the constitutional provision which is plain, clear, and not subject to construction. Nor can such a ruling be justified on the theory that this court sits as a division at any time that a full bench is not available for the simple reason that a "division" of the court is defined in the very section of the Constitution under consideration. Such an attempted construction would have the effect of nullifying other plain language contained in the constitutional provision and constitute a complete change in its meaning by judicial pronouncement. The court should apply the same rules of constitutional construction when dealing with limitations or grants of power which apply to it as it applies to litigants when constitutional questions are presented for determination. The department of government charged with the interpreting power should be very zealous, it seems to me, to apply the same rules of construction to its own grants and limitations of power that it applies to others. If the highest court of a state may construe plain provisions of the Constitution, dealing with the powers of the court, according to its own views of what it should be instead of what it is, the court becomes, in effect, a continuing constitutional convention. It requires no condemnation in terms to point up the fact that such a willful disregard of its constitutional authority strikes at the very foundations of constitutional government.

The effect of the court's action is to deprive the defendant of the fruits of his judgment by a process not authorized, but in fact condemned, by the Constitution. I submit that the record shows on its face that an affirmance

is required and that the purported action by Simmons, C. J., Yeager, Messmore, and Wenke, JJ., authorizing the participation of Kokjer, District Judge, in order to secure a purported majority, is in direct violation of the Constitution, and wholly void. The judgment of reversal being void on its face, it is subject to the same defenses as any other void judgment.

I have been directed by Boslaugh, J., to state that he concurs fully in this dissent.

KOKJER, District Judge, concurring.

I concur in the majority opinion which carefully applies the salutary rules that have been provided by statute and earlier decisions of this court.

A father is charged with the support of his children. When a divorce is granted and custody of the children is awarded to the mother it becomes the duty of the district court to inquire into the reasonable needs of the children and the ability of the father to supply those needs and to direct him to pay within the limits of his ability the amount required for that purpose. As has been pointed out in the majority opinion, the statutes provide that if the circumstances of the parties shall change or if it shall be to the best interests of the children the court may afterwards from time to time on its own motion or on the petition of either parent revise or alter to any extent the decree so far as it concerns the care, custody, and maintenance of the children or any of them. The parents have no right to alter the terms of the decree except by means of such court procedure. As each installment becomes due it becomes fixed and final and even the court has no power to change it. Supporting authorities for these rules are set out in the majority opinion. The dissenting opinion concurs in the rules.

These rules are good because they help to assure proper care of the children. They make it difficult for a father to escape supporting his children by the many artifices and pressures men use to get their divorced spouses to

accept less than is needed for the maintenance of the children. For example: A man lets the payments become delinquent, he tells his former wife that he cannot pay, that he will quit his job, that he will lay in jail if necessary, that he will leave the state and pay nothing unless she will settle for less. The mother may be made to believe that she will be better off to take what he is willing to pay than to insist on getting what the children actually need and what he is actually able to pay.

The parties in this case appear to have been well advised of these rules because at one stage of the proceedings they followed them. The divorce was granted on May 18, 1939, custody of the 8-year-old daughter of the parties was awarded to plaintiff, and defendant was directed to pay $40 per month for her support. On November 29, 1939, defendant filed a petition praying that the child support payments be reduced. Plaintiff filed an answer and cross-petition praying for an increase to $75 per month. The district court heard these petitions and presumably taking into account the minor daughter's needs and defendant's ability to pay, entered a decree on February 15, 1940, increasing the allowance for child support to $50 per month. Little more than 9 months later the parties signed the stipulation whereby Aneita F. Ruehle agreed to accept $104.92 in full payment of delinquent installments totaling $229.84 on condition that court costs of $38.79 and a balance due to her attorney for fees in the case were paid in full. It was further agreed that she would accept $15 payments on the 1st and 15th of each month and would release her judgment for accrued amounts each 3 months. There is no explanation in the record as to why this stipulation was signed. It may be inferred that the defendant desired to relieve himself of a part of the burden of supporting his daughter; that he did not have grounds to believe that the court, which had recently determined the amount of $50 a month was required and that he

had the ability to pay that amount, could be persuaded that conditions had changed. In that situation the stipulation offered a way out for him. But why did plaintiff and her attorney go along with this plan? The record does not tell us. Had she become more affluent or less needy since she had asked for an increase to $75 per month? Or, seeing that defendant had failed to keep up his payments until he was $229.84 in arrears, were they convinced he could not be compelled to pay according to the decree without great trouble and expense and decided to take what he was willing to offer? In any event it is clear that the stipulated agreement was void from its inception. It was illegal and it was not based on any consideration whatever. Did the parties change their positions in any way because plaintiff accepted the smaller payments for several years? The only change indicated by the record was that plaintiff received less than she was entitled to receive and defendant paid less than he was supposed to pay. Can it be believed that it cost plaintiff only $30 a month—$1 a day—to furnish board, room, clothing, medical and dental care, and incidental expenses for the daughter of the parties? Someone had to pay the difference and it is fair to infer that the plaintiff paid the additional amounts required.

It is true plaintiff accepted the $30 a month and it is also true that the daughter is now of age. Under these circumstances is plaintiff estopped on any equitable basis from collecting the balance due her? Should it be held that if a man holds such an illegal advantage long enough it becomes transformed into an equitable defense? If the mother accepts the reduced payments the father is willing to make and by her own efforts furnishes the added amounts required to feed, clothe, and shelter her daughter until she attains her majority, should that fact relieve the father of his liability?

Circumstances may be imagined which would support an equitable estoppel, but the record in this case does not describe any such circumstances.

On October 12, 1948, there was an oral agreement between the parties whereby defendant agreed to pay the daughter's expenses in college and plaintiff agreed to return to him the installments of child support as they should fall due. A careful examination of the record clearly shows that the agreement applied to those child support payments only which were to fall due thereafter. There is no hint in the evidence that the parties agreed to settle for any delinquent accruals. There was a good and valuable consideration for this agreement; it was for the best interests of the minor child involved; it was fully performed by both parties. As to the installments falling due after October 12, 1948, there was a valid accord and satisfaction and this was recognized in the majority opinion.

It is recognized that payment in a lump sum will be more of a burden than paying in monthly installments. Also that interest required by statute to be paid on the judgment will add to the burden. This is unfortunate. By requiring plaintiff to pay her own attorney's fees and expenses in this proceeding, which under the law could be taxed to defendant, the majority opinion gives some measure of relief in this regard.

YEAGER, J., concurring.

SIMMONS, C. J., dissenting in part and concurring in part.

As stated by Judge Carter, I concur in the conclusions reached by him on the issues presented by this appeal. I would, however, rest the decision on the issues presented by the parties and would hold that the judgment was satisfied by the agreement of October 12, 1948, and that that agreement was supported by a sufficient consideration. See, Asmus v. Longenecker, 131 Neb. 608, 269 N. W. 117; Fluckey v. Anderson, 132 Neb. 664, 273 N. W. 41; Koenig v. Koenig (Mo. App.), 191 S. W. 2d 269; Bidinger v. Bidinger, 89 Ohio App. 274, 101 N. E. 2d 241; Schnierle v. Schnierle, 33 Ohio L. Ab. 212,

33 N. E. 2d 674; Lochrie v. Lochrie, 232 Mo. App. 153, 108 S. W. 2d 178.

Before discussing in some detail the majority and the concurring opinion, I think it advisable that we determine the issues presented by the pleadings to the trial court and to this court for determination.

An analysis of the issues demonstrates the error of the decree ordered by the majority opinion; it supports my views as to the intent and scope of the accord and satisfaction of October 1948; and it supports the views of Judge Carter that an equitable estoppel applies here.

In the recent case of Rodgers v. Jorgensen, 159 Neb. 485, 67 N. W. 2d 770, we restated these rules: "A party may at any and all times invoke the language of his opponent's pleading, on which a case is being tried, on a particular issue, and in doing this he is neither required nor allowed to offer such pleading in evidence in the ordinary manner."

"The pleadings in a cause are, for the purposes of use in that suit, not mere ordinary admissions, * * * but judicial admissions * * * i. e., they are not a means of evidence, but a waiver of all controversy (so far as the opponent may desire to take advantage of them) and therefore a limitation of the issues. Neither party may dispute beyond these limits. Thus, any reference that may be made to them, where the one party desires to avail himself of the other's pleading, is not a process of using evidence, but an invocation of the right to confine the issues * * *."

What are the judicial admissions made by the mother in this case that limit and confine the issues?

The father filed his petition asking for a decree that he had satisfied the child support judgment.

The mother by cross-petition pleaded the decree of May 18, 1939, awarding $40 a month child support. She pleaded the decree of February 15, 1940, awarding $50 a month for child support. She pleaded the stipulation of November 28, 1940, wherein it was agreed that the

father would pay certain court costs and attorney's fees and that thereafter would pay $15 on the 1st and 15th day of each month and that every 3 months the mother would release the judgment for child support "for the amounts accrued" and that if the father failed to make the payments the mother "at her election may terminate this agreement." The mother pleaded this agreement and relied upon it.

She then pleaded: "Said decree, as modified on February 15, 1940, and as further modified by the stipulation of the parties, dated November 28, 1940, *is still in full force and effect,* and the terms thereof are clear and unambiguous." (Emphasis supplied.) She filed that judicial admission on August 8, 1953. She then alleged that the father had breached the stipulation by failure to pay the court costs and attorney's fees "upon which the reduction in the amount of child support payments was conditioned * * *." She then in 1953 elected to terminate the agreement of November 28, 1940, as it provided she could if the payments were not made. Upon the trial the proof was that the court costs and attorney's fees had been paid and at the trial at the conclusion of plaintiff's case with consent of that court, she deleted her allegation that the court costs and attorney's fees had not been paid. Hence her reason for terminating the agreement in 1953 disappeared.

Clearly, then, up until August 1953, the mother recognized the agreement of November 1940 as a valid and binding agreement. She challenged it then for the first time *prospectively.*

At the same time, without changing her allegation of fact herein set out, she added the allegation of a conclusion of law that the stipulation was wholly without consideration and void. That contention was advanced February 3, 1954.

The mother prayed for specific relief in full accord with the allegations of her petition. She prayed "that an accounting be had of the amount due the plaintiff

under, and by virtue of, the decree of this court, rendered herein on May 18, 1939, and as modified by decree dated February 15, 1940, and as further modified by the stipulation * * * dated November 28, 1940."

That is the issue which the mother made in the district court and which remains the issue here.

Under that judicial admission, limiting and defining the issues of this case, the only relief to which the mother is entitled here would be an accounting of the amounts due, if any, from June 1949, when the father quit paying that $30 a month, to August 1951, when the child became of age.

Now what does the majority do under those allegations and that prayer? They deny the relief for which she pleaded and grant her relief for which she did not ask and about which by every intendment she alleged she was not entitled.

It may be said that the mother also prayed for "further and different relief."

However, it has long been the rule that a decree must conform to the pleadings and the evidence. Ross v. Sumner, 57 Neb. 588, 78 N. W. 264; State ex rel. Connolly v. Haverly, 62 Neb. 767, 87 N. W. 959; Banking House of A. Castetter v. Dukes, 70 Neb. 648, 97 N. W. 805.

In State ex rel. Emerson v. Dickinson, 59 Neb. 753, 82 N. W. 16, we held: "It is a rule everywhere recognized by courts administering our system of jurisprudence that the relief awarded by a court must respond to the issues—must be within the case made by the pleadings."

Here the majority order a decree that does not respond to the issues, is not within the case made by the pleadings, and is in direct contradiction of the issues and pleadings.

I go now to the concurring opinion of Judge Kokjer. In large part it is based upon a hypothetical case or

cases that have no support in either the issues presented or the evidence in this record.

It states the duty and power of a court to require the father to provide, within the limits of his ability, for the reasonable needs of his minor children.

At this state of the proceedings there is no minor child involved. The minor child became of full age on August 17, 1951. Whether the father is now required to pay all or part of the so-called delinquent payments, that payment cannot retroactively contribute anything to the support and maintenance of the minor daughter.

Any payments now required to be made by the father to the mother would result in the enrichment of the mother and would award money to her that was never intended to be for her benefit.

If we had a case where the support of a minor child were involved, it would present a different issue and require a different answer. But that case is not this case.

The concurring opinion assumes, without any basis of fact whatever in this record, that $30 a month was actually insufficient to pay the cost of the care of the daughter for the period from 1940 to 1948 and that "Someone had to pay the difference and it is fair to infer that the plaintiff paid the additional amounts required." Later the concurring opinion holds that the mother "by her own efforts" furnished the added amounts. The mother makes no such claim. There is no claim or evidence that the payments made from 1940 to 1948 were actually insufficient to meet the needs of the daughter. There is no claim or evidence that the daughter was inadequately supported. In fact there is no evidence in this record as to what part, if any, of the $30 was spent on the daughter. The most that can be found from this record is that the mother received the $30 a month, that the daughter lived with the mother, and that all parties were fully satisfied with

the payments and the support. So that case and that inference is not this case.

The concurring opinion refers to a father who by "many artifices and pressures" gets a wife to accept less than is needed for the maintenance of the minor children. The "example" contains elements that are not supported by any evidence in this record. It is true that in 1940 the father was delinquent in payments then required by the decree. It is true that he then told his wife that he could not pay the full amount. It is true that the mother accepted the lesser amount. It is also true that from 1940 the mother never challenged the payments as insufficient either to meet the decree or to meet the needs of child support. Rather it affirmatively appears that she accepted them each month without question or protest. In 1953 for the first time, she demanded the so-called delinquent payments. She did not assert that the payments made were insufficient for the support of the child, nor did she assert that she had paid her own funds for that purpose so as to show even an equitable interest in the payments now demanded. So that case is not this case.

The concurring opinion holds that in November 1940 when the stipulation was signed providing for payments of $30 per month "It may be inferred that the defendant desired to relieve himself of a part of the burden of supporting his daughter * * *," and that "the stipulation offered a way out for him." That is said of a father, who deprived of the custody of his daughter by court decree, as this record shows, voluntarily, encouragingly, and willingly both before and after the agreement of October 12, 1948, and both during and after the daughter's minority, paid the cost of her college education and of fitting her to earn a livelihood in an honorable profession. And this record shows without dispute that he did it over the expressed views of the mother that it would be of no avail.

The concurring opinion speaks of the "illegal advan-

tage" which the father held. The father for 9 years kept his promise to pay the $30 a month. Was that an illegal act? The majority recognize it as a legal act to the extent that he is given credit for those payments on the court decree. Is the court now holding that part payment or failure to make full payment is an illegal act? The father kept his promise to give the daughter a college education in return for a promise of the mother that "she would release the child support." Wherein does that create an "illegal advantage"?

But what about the "advantage" that the majority now give the mother? For 9 years she failed to keep her promise to release the judgment for child support "at the expiration of each three months" period after the payment of the $30 a month was made. The mother is accorded the advantage of that failure to perform.

For 9 years she accepted these payments, then refused them because of the fact that the father was educating the daughter and spending in excess of the requirements of the decree; for 13 years she led the father to believe that he was meeting his full obligation and more and now is accorded the advantage of relief from an equitable estoppel.

Should not the same rule of advantage and disadvantage apply alike to both parties?

The concurring opinion holds that circumstances may be imagined which would support an equitable estoppel but that this record does not describe it. If this record does not call for an application of equitable estoppel, then I can conceive of none that would.

But the majority admit, and the concurring opinion explains, the basis of an equitable estoppel which they apply.

The concurring opinion states that the requiring of a lump sum payment with interest is an added burden to the father. Under the theory of the concurring opinion it is a burden exclusively of his own making. But the concurring opinion holds "This is unfortunate," so the

majority require the mother to pay her own attorney's fees and expenses so as to "give some measure of relief in this regard." Why "unfortunate"? Why "some measure of relief"? That is another way of saying that it would be inequitable to compel him to pay those items, so they release them indirectly by an equitable balance! If the father were one who had sought to "relieve himself" of part of the "burden" of supporting his daughter; if he were a user of "artifices and pressures" to escape those burdens in part; if he were one who claimed the benefits of "an illegal advantage"; if he were one who compelled the mother "by her own efforts" to furnish the support he was bound to furnish; if he were one who sought "a way out" from the burdens of the decree, he would be entitled to no relief. I submit that if he is entitled to "some measure of relief" he is entitled to a full measure. The majority accord him a wee bit of equity by requiring the appellant to pay her own attorney's fees and expenses in this proceeding.

Heretofore we have denied attorney's fees in this class of cases where there was "no reasonable justification" for the position taken by the party claiming them. See, Eicher v. Eicher, 148 Neb. 173, 26 N. W. 2d 808; Sell v. Sell, 148 Neb. 859, 29 N. W. 2d 877. In the above cases we denied attorney's fees to the unsuccessful appellants. Here the majority deny attorney's fees to the successful appellant. I submit that if there is justification for the denial of attorney's fees to the mother, then there is justification for the granting of full equitable relief to the father.

I now go to an interesting contradiction. The concurring opinion in an opening paragraph states: "The parents have no right to alter the terms of the decree except by means of such court procedure." In a concluding paragraph it is held that a mutual agreement of the parents, based on a good consideration, for the best interests of a child, if fully performed, constitutes a valid accord and satisfaction which is enforceable.

An accord and satisfaction of what? The decree, of course. The resultant effect is the altering of the terms of the decree as to both amount and place of payment without court procedure or approval, and in complete variance from the terms of the decree.

Finally, then, we get down to this situation: The majority hold that the oral agreement of October 1948 was a valid one supported by an adequate consideration. I agree. The question then remains as to what were the terms and extent of the accord and satisfaction.

The concurring opinion holds "A careful examination of the record clearly shows that the agreement applied to those child support payments only which were to fall due thereafter. There is no hint in the evidence that the parties agreed to settle for any delinquent accruals."

There is no mention of "delinquent accruals" in the evidence for the obvious reason that both parties at that time and for 8 years prior thereto had accepted as a fact that there were none—that all payments due had been met. There was no occasion to mention delinquencies. What did they mention, and why?

I now recapitulate the status of this matter as it stood on October 12, 1948. On May 18, 1939, the divorce decree required that the father pay $40 a month child support. By decree entered on February 15, 1940, these child support payments were increased to $50 a month effective March 1, 1940. The father defaulted in part in those payments and then came the "stipulation" of November 28, 1940, under which the father agreed to pay and the mother agreed to accept $30 a month and to release the judgment at the expiration of each 3-month period. The father thereafter paid the $30 a month; the mother accepted it without question but did not release the judgment as she had agreed to do.

In September 1948, the daughter wanted to go to college. The father, continuing to pay the $30 a month, then voluntarily paid the entrance fees, tuition, miscel-

laneous items, etc., for her entrance in collage. These items are shown to be well in excess of $100. The daughter continued to live at home with the mother. The father continued to pay the $30 a month.

The father at that time assumed and paid the increased expenses incident to the beginning of a college career without agreement of any kind.

In October 1948, the daughter desired to remove to the campus and become a resident student there. The father then told the daughter and the mother that he could not pay that increased expense and continue to pay the child support payments to the mother. The mother had doubts about the daughter making a success of a college career. It was then agreed that the father would continue to pay the child support payments to the clerk of the district court and the mother would return them to the father until it was determined whether the daughter would continue in school and if she did not then "we would go back to the original status of the agreement."

Obviously they were to return to the original status of the agreement only in the event the daughter did not continue in school.

By June of 1949 the daughter was succeeding in college and was ready to enter summer school. The $30 a month payments had been made and had been returned to the father. The mother then directed that the $30 a month payments be stopped and there never was any occasion thereafter to "go back to the original status of the agreement."

The daughter testified that there was conversation about the mother releasing the father "from the payment of this $30 a month child support"; that her mother said it was all right for the daughter to go to college; that the father would pay the expenses and that the mother "would release the child support"; and that a "fair summary" was that the mother would "drop the child support" and the father would pay the college ex-

penses. The bill of exceptions shows that the mother was in the courtroom when the trial began. She was not called to testify. The above constitutes the direct unchallenged evidence of the agreement of October 12, 1948, which the majority holds was supported by a sufficient consideration and which the father fully performed.

On the theory of the majority, the partial delinquencies that had accrued over the years were due and payable in a lump sum with interest on October 12, 1948, and remained in that status on and after October 13, 1948.

Did the father bind himself to pay the costs of a college education in return for only a partial release of child support payments?

Obviously neither the father or the mother had such intention and just as obviously the mother had no secret intention that sometime in the future she would exact the arrearages.

Had there been any intent otherwise, would not the mother have demanded or at least mentioned the full payment of the arrearages? Would not the father have demanded that the increased payments be credited to the delinquencies? Nothing of the kind was done. Neither of the parties contemplated such a demand.

How did the parties construe the agreement? For almost 4 years the mother accepted as a fact that the child support was released and satisfied. Patently, the father so considered it. Throughout her minority and after attaining her majority, the daughter, who was the beneficiary of these payments, so considered it. She does not now question that construction. All of the parties recognized that the accord of October 1948, when fully satisfied and performed, ended the matter. That was the common intent. On that basis there was full performance.

By the undisputed evidence, a return to the original status was not to have occurred if the daughter continued in college, which she did. The father fully performed the agreement of October 12, 1948.

The condition upon which a return to the original status depended, did not arise. The only reasonable conclusion that can follow from this evidence is that if the daughter continued in college and the father paid the expense, that that ended the child support obligation finally and positively. The daughter did continue in school. The father did pay all the expenses in accordance with the agreement. There is no "hint" in the record upon which any other conclusion can be based.

The majority hold that there was a sufficient consideration for the October 12, 1948, contract. That contract the majority hold is enforceable. That contract prevents a recovery by the mother. The majority now require the father to pay the child support which has been fully satisfied in accordance with this agreement.

The above demonstrates also the basis for the minority's position that an equitable estoppel applies.

In Cady v. Travelers Ins. Co., 93 Neb. 634, 142 N. W. 107, we stated this rule: "The practical interpretation given their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent, and the courts will ordinarily enforce such construction."

We last stated it in Consumers Cooperative Assn. v. Sherman, 147 Neb. 901, 25 N. W. 2d 548, in this way: "The practical interpretation given an indefinite or ambiguous contract by the parties to it while they are engaged in its performance, and before any controversy has arisen concerning it, is one of. the best indications of its true intent, and the courts will ordinarily enforce such construction."

In Dunn v. Mutual Benefit Health & Accident Assn., 135 Neb. 506, 282 N. W. 487, we said: "We know of no better way of determining the intent of the parties than by giving the contract the effect that the parties themselves gave it."

In James Poultry Co. v. City of Nebraska City, 135

Neb. 787, 284 N. W. 273, we held that a practical construction, to be adopted, "must be reasonable." Here the construction placed on the contract by the parties is obviously a reasonable one.

It seems to me that these rules are particularly applicable where a contract is in parol, and its terms testified to long after the event and long after full performance has been had.

I would affirm the judgment of the trial court.

I disagree with Judge Carter in his conclusion that the participation of Judge Kokjer in this case is in "direct violation of the Constitution, and wholly void."

We should have a more complete statement of the factual situation. This requires the use of names of the members of the court. Although it is probably unnecessary, in doing so I wish to assure the bar that there is no personal acrimony involved at any stage of these proceedings. Language used by Judge Carter, coming from another's pen might be "fightin' words," but from Judge Carter's it is not so.

This case was orally argued to the court, with six judges sitting, on January 5, 1955. Judge Chappell did not sit because of a personal disqualification. In regular order it was assigned to Judge Messmore for study and the preparation of a proposed opinion. Judge Messmore submitted a proposed opinion and on February 26, 1955, it failed to receive the requisite vote for adoption. On that date the case was assigned to me in regular order, I being one of the judges not voting for Judge Messmore's opinion. In March 1955, I prepared and submitted a proposed opinion. It likewise was not adopted.

The case was set for reargument, along with 14 other cases, for the week beginning May 2, 1955. Due to the absence of Judge Messmore, Judge Kokjer was invited to sit as a member of the court considering all 15 cases argued that week. He sat with us and participated in the consideration of cases submitted that week. In

regular order the cases of Kasai v. Kasai, 160 Neb. 588, 71 N. W. 2d 105; Olson v. State, 160 Neb. 604, 71 N. W. 2d 124; and Ruehle v. Ruehle were assigned to Judge Kokjer for study and the submission of proposed opinions. Judge Messmore, although absent, was recognized as participating in the reargument and resubmission of the instant case.

Judge Kokjer prepared and submitted proposed opinions in the first two of the above cases and they were adopted by the court.

Parenthentically, it may be added that District Judge Flory sat with us during the week beginning May 31, 1955, heard argument, participated in the conferences, prepared opinions which were adopted, and voted for or against opinions of other members of the court in the cases argued that week.

The summer recess intervened. At a consultation this fall, Judge Messmore offered his proposed opinion in its present form with the statement that Judge Kokjer was in favor of it.

*For the first time,* a challenge was then made, directed to the right of Judge Kokjer to participate in the decision. The case was held over. I then investigated the matter, prepared a memorandum, which was submitted to the court, in which I concluded that Judge Kokjer was, under the Constitution, sitting with "all the powers" of a judge of this court. At the consultation on November 5, 1955, the opinion of Judge Messmore was adopted by a majority vote. If that be "acquiescence" on my part, then it is "acquiescence" in my own opinion.

I agree with Judge Carter that this matter has been discussed from "time to time" in the conference room. However, when it has arisen, it has been resolved as the court has resolved the instant challenge.

When I came upon the court, Judge Rose was the only member who had been here both before and after the adoption of the present constitutional provisions. During the years I was privileged to sit by his side, I never

heard him challenge our procedures in this regard. Had there been constitutional error he would have been the first to do so.

Judge Carter states that he knows of no case where the "regular members of this court" divided equally, and the vote of a district judge caused a reversal of the trial court. Apparently the theory is that an unconstitutional procedure is of no consequence if a constitutional result is had. I disagree.

I call attention to Hartford Fire Ins. Co. v. County of Red Willow, 149 Neb. 10, 30 N. W. 2d 51. That case was heard before six "regular members" and one district judge. The "regular members" divided equally on the merits. The vote of the district judge resulted in an affirmance. On Judge Carter's theory that result would have followed in any event. He cites text authority to that effect.

The same authority states (textwise): "Constitutional or statutory provisions requiring that a designated number of judges shall concur in an opinion in order that there may be a valid and binding adjudication by the court, or in order that a statute be declared unconstitutional, must, of course, be complied with." 21 C. J. S., Courts, § 184(a), p. 295.

"Where, upon the question whether relief should be granted or refused, the judges constituting the court are equally divided in opinion, full relief cannot be granted, and the subject matter with which the court is dealing must remain in statu quo, although relief may be granted in so far as a majority deems the relief sought appropriate." 21 C. J. S., Courts, § 184(b), p. 296.

I shall not labor those propositions down that detour. So far as this state is concerned, it is answered in Article V, section 2, of the Constitution, which provides: "A majority of the members sitting shall have authority to pronounce a decision except in cases involving the constitutionality of an act of the Legislature." That is plain and unambiguous language and negatives Judge Carter's

view in that regard. Later herein I shall develop the history of that provision.

If Judge Carter's position is correct here then there was no authority for District Judge Kroger to sit in the Hartford case and this court did not have authority to pronounce a decision. Rather that appeal should have been affirmed because of a failure to secure the required votes to pronounce a decision and to order affirmance. Yet we did "pronounce a decision" which has since been followed by this court as a precedent. See, Klause v. Nebraska State Board of Agriculture, 150 Neb. 466, 35 N. W. 2d 104; Novak v. Laptad, 152 Neb. 87, 40 N. W. 2d 331; Bay v. Robertson, 156 Neb. 498, 56 N. W. 2d 731; Shiers v. Cowgill, 157 Neb. 265, 59 N. W. 2d 407; Andelt v. County of Seward, 157 Neb. 527, 60 N. W. 2d 604, wherein a unanimous court referred to the "decision of this court."

Judge Carter holds that the provision of the Constitution here involved is "plain and without the semblance of ambiguity"; that the Constitution is "plain, clear and not subject to construction"; that the action of the court is "an apparent disregard of the pertinent provision" of the Constitution; that it "changes the plain language of the Constitution" "by judicial pronouncement"; that it constitutes a willful disregard of our constitutional authority by a process "condemned, by the Constitution"; and that the decision is in "direct violation of the Constitution."

That is an indictment, serious enough if leveled at the four members of the court against whom it is directed. But as can be demonstrated, it is applicable to every member who has sat on this court for any length of time since January 1, 1921, when the present Constitution went into effect.

This challenge goes not to the question of whether the judge votes for affirmance or reversal, but to the question of the power of this court to appoint a district judge or judges to sit with the court to decide cases.

Does a district judge, appointed to sit under the circumstances of this case here, "have all the powers of judges of the supreme court" (Art. V, § 2, of the Constitution), or is he an invited guest, privileged to listen to our deliberations, advise us, and on occasion submit opinions for us to consider and adopt, but without the power of judges of this court to vote for or against an opinion? Is he ineffective at the point where effective action is required?

Judge Carter holds that in this matter we should apply the same rules of constitutional construction as apply to litigants when constitutional questions are presented. I agree. He cites no such rules. I go to our decisions.

In In re Hammond, 83 Neb. 636, 120 N. W. 203, 23 L. R. A. N. S. 1173, we held: "* * * the words of the constitution are to be interpreted with reference to the established laws, usages and customs of the country at the time of its adoption, and the course of ordinary and long-settled proceedings according to law."

This was last cited with approval in State ex rel. Caldwell v. Peterson, 153 Neb. 402, 45 N. W. 2d 122.

In State ex rel. Central Realty & Investment Co. v. McMullen, 119 Neb. 739, 230 N. W. 677, we quoted with approval this holding from Hinz v. Musselshell County, 82 Mont. 502: " 'Our state Constitution must be construed in the light of the history of the commonwealth, the surrounding circumstances, the subject-matter under consideration, the object sought to be attained, as well as the system of laws which were in force in the territory at time of its adoption.' " This was repeated with approval in State ex rel. Johnson v. Chase, 147 Neb. 758, 25 N. W. 2d 1.

In State ex rel. State Railway Commission v. Ramsey, 151 Neb. 333, 37 N. W. 2d 502, we held: "A Constitution is intended to meet and be applied to any conditions and circumstances as they arise in the course of the progress of the community. The terms and provi-

sions of constitutions are constantly expanded and enlarged by construction to meet the advancing affairs of men. While the powers granted thereby do not change, they do apply in different periods to all things to which they are in their nature applicable."

The court also held: "The meaning of a constitutional provision is to be determined as of the time of its adoption, and the intent and understanding of its framers and the people who adopted it is the principal inquiry in construing it.

"It is permissible in determining the meaning of language of a Constitution to consider the facts of history, the evil intended to be overcome, the objects sought to be accomplished, and the scope of the remedy its terms include."

There is not one but are three separate provisions of the Constitution in Article V, section 2, relating to the judicial membership of the court. Each deals with a separate situation:

1. "A majority of the judges shall be necessary to constitute a quorum. A majority of the members sitting shall have authority to pronounce a decision except in cases involving the constitutionality of an act of the Legislature."

2. "Whenever necessary for the prompt submission and determination of causes, the supreme court may appoint judges of the district court to act as associate judges of the supreme court, sufficient in number, with the judges of the supreme court, to constitute two divisions of the court of five judges in each division. Whenever judges of the district court are so acting the court shall sit in two divisions, and four of the judges thereof shall be necessary to constitute a quorum."

3. "The Judges of the supreme court, sitting without division, shall hear and determine all cases involving the constitutionality of a statute, and all appeals from conviction of homicide; and may review any decision rendered by a division of the court. In such cases, in

the event of the disability or disqualification by interest or otherwise, of any of the judges of the supreme court, the court may appoint judges of the district court to sit temporarily as judges of the supreme court, sufficient to constitute a full court of seven judges."

A practice which began in January 1921, when the above provisions became effective, and has continued down to our sessions of last April and May must have had authority behind it. We have no one on or about the court now who was here when the constitutional provision was adopted and became effective.

We held in Elmen v. State Board of Equalization & Assessment, 120 Neb. 141, 231 N. W. 772: "* * * we are justified in taking judicial notice of proceedings in the constitutional convention * * *." See, also, State ex rel. Johnson v. Marsh, 149 Neb. 1, 29 N. W. 2d 799.

In the press recently, I noticed a statement of the prayer of a Sioux Indian. It was: "Great Spirit, help me never to judge another man until I have walked two weeks in his moccasins."

I propose now to go back after 35 years and, so far as possible, walk in the moccasins of the members of the Convention which framed these above provisions. In doing so I shall undertake to discover "the intent and understanding of its framers" as appears from the proceedings of the Constitutional Convention. I shall discuss the proposals in their sequence in order of time, for by so doing the error of Judge Carter's conclusion is clearly demonstrable. The construction which he visions so clearly disappears when exposed to that light.

I shall refer to the above three provisions as authorities 1, 2, and 3. I shall refer to the Proceedings of the Constitutional Convention of 1920 by page only.

Prior to the adoption of the present provisions, the Constitution provided: "The supreme court shall consist of seven (7) judges; and a *majority of all the elected and qualified judges* shall be necessary to constitute a quorum or pronounce a decision." Article VI, section 2,

of the 1875 Constitution. (Emphasis supplied for reasons appearing later herein.)

First what was "the evil intended to be overcome" by the substantial amendment to the Constitution regarding the Judicial Department? It was, in great part, the delay in this court in reaching and determining causes due to the congestion of cases on our dockets. It was legislatively recognized in 1917 and again in 1919 when the Legislature created a Supreme Court Commission "to aid the Supreme Court to clear its docket." See, Laws 1917, c. 173, p. 389; Laws 1919, c. 260, p. 1057.

The Constitutional Convention convened on December 2, 1919.

Also that week this court and the commission sat for oral argument in a large number of cases. Except for cases advanced, the cases heard that week had been on the docket for periods of from 12 to 20 months— and that although the commission for years had been aiding the court to clear its docket.

The Convention created a Committee on Judicial Department. (Page 58.) The membership was largely made up of lawyers. Mr. Heasty, a lawyer, became chairman of the committee. A large number of proposals were referred to it. On February 5, 1920, the committee reported recommending that all those proposals be indefinitely postponed and on that date it introduced an "in lieu" proposal by unanimous action. (Page 676.) This proposal then became the basis of all subsequent action.

These proposals were summarized by Mr. Epperson (page 1145) and will not be repeated here.

The committee recommended changes and additional provisions that became the foundation of what I have designated as authorities 1, 2, and 3 (page 676). I shall return later to those changes.

Mr. Heasty, chairman of the committee, said "there were two dominant ideas confronting the Committee. First, that so far as the judicial department was con-

cerned there would be no more constitutional officers created, and secondly, that the congested docket of the supreme court should be cleared up; that the Committee should devise some way, some means, by which the supreme court will be able to take care of its business with reasonable expedition * * *." (Page 993.) Other statements of similar effect were made by members. They need not be cited as there was no dispute on that intent as the evil to be overcome.

As Mr. Donohoe, now and for many years past United States District Judge, said, the proposals were designed ultimately to enable the court to get its work "brought up to date. When that time arrives, then the court might sit as a united court, and these other members would be relieved of that work." (Page 1006.)

As I see it, a narrow question to be determined is the meaning of the word "division" as the framers of the Constitution used and intended it.

Of the three authorities, what I term here authority 2 was the first to be debated. For convenience I restate it:

2. "Whenever necessary for the prompt submission and determination of causes, the supreme court may appoint judges of the district court to act as associate judges of the supreme court, sufficient in number, with the judges of the supreme court, to constitute two divisions of the court of five judges in each division. Whenever judges of the district court are so acting the court shall sit in two divisions, and four of the judges thereof shall be necessary to constitute a quorum."

It was ultimately adopted substantially as offered, except for changes proposed by the Committee on Arrangement and Phraseology. (Page 1384.) It was not adopted, however, until authority 1 as originally proposed was materially changed and its authority and purpose clarified. That I will discuss later herein.

Mr. Scott proposed that the number of Judges be increased from seven to ten so that the court could sit in

divisions of five men to a court, each of those divisions working separately "just as your two divisions are now working." (Page 999.) Here he referred to the court as a division and the commission as a division. I mention that as I shall other uses of the word division to show the broad inclusive base of the meaning which the members of the Convention attached to it. Mr. Flansburg used the "two divisions" with reference to the court and the commission. (Page 1008.)

Mr. Flansburg proposed that the court have authority to call in lawyers "in case of emergency" three in number and if "dispatch" of work was the goal, have the court sit in divisions of three. (Page 1004.)

Mr. Byrum suggested that under this proposal the court could sit in two divisions "and two alone" and that the provision was "not flexible." (Page 1011.)

Mr. Heasty stated under this proposal the court could sit in two divisions which would be "constituted of five judges each." (Page 995.)

However, Mr. Pitzer, a member of the committee, following him, said: "To divide a court of seven judges into two divisions, with no other additional judges * * * would practically require a unanimous report, but it was for the purpose of giving *some margin in that respect* as well as assistance; that is the committee felt that the divisions when organized should consist *of at least five judges* * * *." (Emphasis supplied.) I find no challenge to Mr. Pitzer's statement.

Early in the debate Mr. Heasty stated that the committee felt it would be unwise to allow less than four judges "to render a decision or constitute a quorum." (Page 995.) As will be pointed out later herein, the committee receded from that "render a decision" view.

In the debates to this point, Judge Carter's views find support and contradiction in the debates. I do not labor that matter further because of the quite clear intent and purpose of the members of the Convention when they considered and adopted what became authority 1.

Before going to that I revert to one contention advanced by Judge Carter, that district judges may sit as members of this court "When the court sits in two divisions of five judges in each division." With that statement I agree, but it is not an exclusive provision. Clearly district judges may sit in a division. But five judges thereof are not necessary, for the next sentence of the Constitution provides that "four of the judges thereof shall be necessary to constitute a quorum." I submit that four and not five judges is the minimum in a division of that class, and that five judges was not intended to be a necessary maximum number, as will appear later herein.

I now go to authority 1. It was adopted as a solution to meet the objections advanced to authority 2. I restate it for convenience:

1. "A majority of the judges shall be necessary to constitute a quorum. A majority of the members sitting shall have authority to pronounce a decision except in cases involving the constitutionality of an act of the Legislature."

The 1875 Constitution provided that: "* * * a majority of all the elected and qualified judges shall be necessary to constitute a quorum or pronounce a decision." Art. VI, § 2. The committee originally proposed that "A majority of judges shall be necessary to constitute a quorum or pronounce a decision * * *." (Page 676.)

The debate on authority 2 began on February 13, 1920. (Page 948.) The debate on authority 1 began on March 16, 1920. (Page 2302.) Mr. Nye proposed that this court be authorized to sit in two alternating divisions of not less than three judges and the Chief Justice, and that three could pronounce a decision when sitting in division. (Page 2306.)

The committee then offered an amendment which had been proposed by Judge Albert of Columbus that in Mr. Heasty's language was in accord with Mr. Nye's proposal except that it did not "cut out the right of the court

to call district judges * * * if the court deems it best and proper" and authorizes "the court to create certain divisions if it sees fit to do so." (Page 2312.) It gave the court the "alternative, sitting in divisions, of calling in the district judges to assist, if necessary." He urged the retention of the power to call in district judges but to preserve the alternative of the court sitting in divisions and calling in district judges if necessary or expedient. (Page 2313.) In answer to a question Mr. Heasty said: "There might be occasion to call in District Judges *or* there might be occasion to sit in division until such time as the court caught up with its work." (Emphasis supplied.) (Page 2315.)

Mr. Flansburg referred to the proposal as one conferring "additional jurisdiction." (Page 2316.)

Mr. Nye held that the court could not sit in two divisions unless three district judges were called in. Mr. Heasty replied: "* * * when the court sits *in divisions, that is as a court,* of course four would sit in one division and the Chief Justice would sit with the other three, * * *." (Emphasis supplied.) (Page 2319.)

Judge Albert then proposed a substitute as follows: "A majority of the members sitting shall have authority to pronounce a decision except in appeals from convictions for homicide and cases involving the constitutionality of an act of the Legislature." (Page 2320.) Later the reference to homicide cases was stricken. (Page 2564.)

With that exception, the substitute became the exact language of the Constitution as stated in authority 1.

Judge Albert said: "The object of this substitute is to enable the court to sit in divisions" (Page 2320); that it "made a flexible arrangement"; and that "if * * * the court as now constituted sitting in two divisions could not keep up with the work, then they could call in these judges and let them try it" and if that did not work they could go back to the "old system." He did not explain what he meant by the "old system" but I

assume he meant the use of a commission. (Page 2321.)

Parenthetically, the Legislature created a commission in 1925, Laws 1925, Chapter 76, page 237; in 1927, Laws 1927, Chapter 69, page 231; and in 1929, Laws 1929, Chapter 85, page 335, to "aid" the court in keeping its docket clear.

Mr. Ferneau—a lawyer—said that if the Albert amendment was adopted it provided "two ways by which the court may dispatch business"; that it was "more elastic"; and that the court would have the right "to sit in divisions" and if "they saw fit to call in district judges." (Page 2322.) He said if the substitute of Judge Albert is adopted "we will have both of these ways incorporated." (Page 2323.) Judge Albert's proposal was adopted by a vote of 67 to 18. (Page 2323.)

Later on March 19, 1920 (page 2547), the matter came up again. Mr. Heasty said that the Judge Albert amendment "permits the Supreme Court to sit in divisions; that four judges *must* sit in each division." (Emphasis supplied.) (Page 2562.) And "It permits an alternative of sitting in divisions or calling district judges." (Page 2563.)

It came up again on March 23, 1920 (page 2658), on third reading (page 2687). Mr. Byrum raised the question that the Albert substitute had been possibly left out. (Page 2691.)

Mr. Heasty assured him that it had not been, and said: "You see the only difficulty that the present Supreme Court has had in regard to sitting in divisions has been due to the fact that the old Constitution required a majority of four to pronounce a decision" (page 2692) and that "the only reason it proved unsuccessful was the fact that our present Constitution required the concurrence of four members to pronounce a decision." (Page 2692.) Mr. Byrum in explaining his vote said: "* * * it seems to be the opinion of the others * * * that it allows the Supreme Court to sit in divisions, with-

out calling in District Judges." He was content. (Page 2697.)

Mr. Nye said he voted for the proposal because it permitted the Supreme Court to sit in divisions "and overshadows the evil of calling in District Judges, which will never be done." (Page 2698.)

In the Address to the People of Nebraska, the Convention, in explaining the proposed amendments, said: "The new Section 2, authorizes the Supreme Court to sit in *divisions,* the Chief Justice sitting in each division, four judges being necessary to constitute a quorum, *but the concurrence of only three judges being necessary to pronounce a decision.* This provision will eliminate the difficulties encountered by the Supreme Court *when sitting in divisions under the present Constitution* requiring the concurrence of four judges to pronounce a decision. *Furthermore,* under this new provision, *if it is deemed advisable,* the Supreme Court may call in District Judges to sit with the Supreme Judges and thereby create two divisions of the Supreme Court of five judges each, for the purpose of disposing of a congested docket. Electors will observe that this system will expedite the work of the Supreme Court without additional expense to the taxpayers." (Emphasis supplied.) (Page 2845.)

The above constitutes a Convention recognition of the fact that the new provision authorized the court as such to sit in divisions as had been done under the then existing constitutional provision. Four judges were "necessary" to constitute a quorum. Concurrence of three judges was "necessary" to pronounce a decision. The "necessary" requirements were obviously minimum requirements, in both instances. Can it be held that the Convention intended that four judges sitting in division would constitute a quorum and that five or six so sitting would not? Or can it be said that three judges concurring could pronounce a decision and that four or five or six so concurring could not? I shall not chal-

lenge the power to so provide. I do contend that, in the language of the street, such a conclusion "does not make sense."

As pointed out above, there is a clear recognition in the debates that the court had sat in "divisions" prior to the present Constitution. How many sat in those divisions?

I have spot-checked one volume of our reports to find the answer. 97 Nebraska covers the period from October 1914 to March 1915. In that volume, there are 90 cases decided with three judges not sitting, 21 with two judges not sitting, and 42 with one judge not sitting. Obviously a "division" was sitting when four, five, or six judges participated.

Authority 3 was not extensively debated so far as the question here is concerned. I quote it again for convenience:

3. "The Judges of the supreme court, sitting without division, shall hear and determine all cases involving the constitutionality of a statute, and all appeals from conviction of homicide; and may review any decision rendered by a division of the court. In such cases, in the event of the disability or disqualification by interest or otherwise, of any of the judges of the supreme court, the court may appoint judges of the district court to sit temporarily as judges of the supreme court, sufficient to constitute a full court of seven judges."

As proposed by the committee, it contained the language that "The Judges of the supreme court, sitting without division * * * may review any decision rendered by a division of the court." It was retained and is in the present Constitution. At the time proposed, it may be that it was intended to relate to a division of the court sitting with district judges. After the adoption of the Albert amendment it likewise related to a division of the court sitting without district judges. There was no occasion to debate it or change it.

It is revealed clearly in the debates and the provisions

of the Constitution as adopted by its framers that the Convention intended, not to put the court in a rigid straightjacket, but to give it "elastic" powers in this regard, so that it could "clear its docket" and "keep it clear," and "take care of its business with reasonable expedition."

The debates show that the members of the Convention recognized that the court, if it chose, might review a decision of a division of the court.

If Judge Carter's position is correct, then the Convention intended to authorize, and the Constitution authorizes, this court sitting without division, to review a unanimous decision made by four judges of this court and one district judge sitting in that class of a division, and does not authorize the review of a decision made by a majority of three judges of this court sitting with a quorum of four judges. That also does not make sense.

If Judge Carter's position is correct, then the Convention intended to authorize, and the Constitution authorizes, one judge of this court and two district judges to pronounce a decision (being a majority of that class of a division) and does not authorize six judges of this court and one district judge to pronounce a decision except in cases involving the constitutionality of a statute, appeals from conviction of homicide, and when reviewing a decision rendered by a division of this court consisting of five judges, one or more of whom is a judge of the district court. Again that does not make sense.

Members of the Convention stated that the purpose was to create a "complete" (pages 1010 and 1011) and "elastic" system. Clearly it was intended that the provisions adopted would enable the court to clear its docket, keep it so, and ultimately, if need be, determine a matter with "a full court of seven judges." From such a system there would, in all probability, be a majority pronouncing a decision.

If Judge Carter is correct, then the Convention cre-

ated a void, a situation where such a majority decision could not be had, and where a judgment of a trial court would be affirmed, not by a decision of the court, but by a failure to decide. Such a conclusion is negatived by the debates and the language of the Constitution. It also does not make sense.

Our procedure in the instant case is authorized under either authorities 1 and 3 or 2. When we heard this case with six judges of this court sitting, we were proceeding under authority 1 in that class of a division. When we granted a reargument we called in a district judge and constituted "a full court of seven judges" to review a decision rendered by a division—the decision being that the division was unable to pronounce a decision by a majority of the members sitting.

Or when we heard this case on reargument we were sitting under authority 2 in the class of a division with a district judge participating.

Accordingly, Judge Kokjer participated in this case with "all the powers" of a judge of this court, including the right to vote for or against either of the proposed opinions.

To so construe and apply the Constitution leaves no void in the powers of this court to pronounce a decision by a majority vote.

We need not stop with an analysis of the intent of the framers of the constitutional provisions. The court was in session here in the Capitol Building when the Convention met, and during its deliberations. I shall now "walk in the moccasins" of the judges of this court for a bit of time.

The proceedings show that members of the Convention were in informal consultation with and secured the advice of the Chief Justice and members of the court during the consideration of the various proposals that resulted in the present constitutional provisions. (See pages 1004, 1009, 1585, 2313, 2319, and 2320 for illustration.) The members of the court would obviously know

what the Convention intended by what it wrote and why it did it. I assume that we may accept the fact that they would undertake to comply with that intent.

The new constitutional provisions became effective on January 1, 1921. The court then began to apply the Constitution in accord with the intent expressed in the debates and in the language of the Constitution. Not only that, but they recognized and gave priority to divisions under authority 1 before inaugurating divisions under authority 2, just as Judge Albert advised the Convention as to the intent of his proposal.

I have examined the Journal for the first 2 years of the court's proceedings under the new Constitution. During this period the court used every one of the authorities and procedures—as the court has done at times during all of the 35 years since.

On January 3, 4, 5, and 6, 1921, the court sat with the Chief Justice and Judges Rose, Aldrich, and Flansburg, and heard argument. On January 6, Judge Letton sat in one case in lieu of Judge Rose. On January 7, the full court sat, with Judge Letton not sitting in two cases argued that day.

On January 13 and 14, the full court sat and entered a series of orders, including the assignment of a large number of cases for hearing before the Supreme Court Commission.

Did this court then construe its act as sitting in divisions? At least one member did, without protest from the other six.

The cases of Kates v. Spencer, 105 Neb. 599, 181 N. W. 520; Weber v. Thompson-Belden & Co., 105 Neb. 606, 181 N. W. 649; Baldwin v. Omaha & C. B. St. Ry. Co., 105 Neb. 614, 181 N. W. 525; and State v. Wright, 105 Neb. 617, 181 N. W. 539, were each argued to four judges in January 1921 (after the new provisions went into effect). At the close of the decisions in each case is this language:

"Letton, J., not being a member of the *division* which heard this case, did not participate." (Emphasis supplied.)

This appears in both the Journal and the printed reports in the above and subsequent cases.

On January 17 and 18, 1921, the court sat with the Chief Justice and Judges Letton, Day, and Dean. This was in accord with the suggestion made in the Convention that when the court sat in divisions of four that the Chief Justice should sit with both divisions.

Thereafter the court sat with four judges at times. On January 28 and 31, and February 2 and 4, 1921, the court sat with seven judges. It returned to sitting with four judges on February 7, 8, 9, 10, and 11, 1921, with the Chief Justice and the same associate justices sitting. On February 14, 15, 16, and 18, 1921, the Chief Justice and four judges sat.

On February 25, 1921, the court sat with the Chief Justice and five associate judges.

On March 4 and 5, 1921, the court sat with the Chief Justice and four associate judges. On March 7 and 8, the Chief Justice and three associate justices sat for oral argument.

On March 12, 14, and 16, 1921, the Chief Justice and four associate justices sat, and on March 19, 1921, five sat with the Chief Justice.

I shall not further exemplify that record.

Clearly the court did not consider that it was limited to four judges when so sitting.

On March 25, 1921, the case of Nabower v. State, 105 Neb. 848, 182 N. W. 493, was decided. There was one dissent. The case was argued on February 11, 1921, to four judges. This appears to be the first case decided by three votes under the majority-of-those-sitting rule.

On April 27, 1921, the Journal shows that for the prompt submission and determination of causes the court was appointing district judges to sit as acting associate judges. Two were named for each week from May 2, 1921, to June 6, 1921. That was followed with this: "The court will sit in divisions at the times stated, one

division sitting each week." This was a procedure under authority 2.

On May 3, 9, 11, 12, 17, 19, and 31, 1921, four judges of this court sat with two district judges.

On May 4, 5, 10, 13, 20, 23, 24, and 25, 1921, three judges of this court sat with two district judges. The same number sat on June 1, 2, 3, 6, 7, 8, and 9.

Thus the court construed the elastic provisions of the court's power under authority 2 when it was first exercised. This court since that time has followed that procedure and precedent.

In September and October 1921, a new pattern of procedure appears. Alternate weeks the court sat with four members of this court and two district judges, and the next week it sat with three members of this court and two district judges.

The same pattern appears in November 1921.

Beginning Novembr 10, 1921, the Journal shows "Sitting as Division No. 1," four judges of this court and two district judges, and "Sitting as Division No. 2," three members of this court and two district judges. The same situation is shown in the Journal for December 12, 13, and 16, 1921, and February 6, 7, 8, 9, and 10, 1922. There is a clear recognition by the court of the fact that it was sitting in divisions under authority 2 and with a division of more than five judges.

It was suggested during the debates of the Convention that the calling of district judges for short periods of time might not be satisfactory either to the court or to the district judges.

Whether that was found to be true is not disclosed. In any event, on September 15, 1922, the court, finding it necessary for the prompt submission and determination of causes, appointed District Judges Redick and Shepherd to act as associate judges of the Supreme Court from October 2, 1922, to January 1, 1923. During that period of time the court sat in "division," but not in two divisions sitting simultaneously, as was done at

times in the earlier proceedings. Most of the time both Judges Redick and Shepherd sat with, in one instance at least, three of the "regular" judges, occasionally with four judges, and more often with five, making "a full court of seven judges." When the district judges sat singly, they sat with four, five, or six of the "regular" judges. The same procedure was followed from January 1 to March 30, 1923, with District Judges Troup and Raper sitting. And thereafter it was followed by the calling in of district judges for similar lengths of time.

On May 18, 1922, the court sat with six members of this court and Judge Redick as district judge. One of the cases argued was Chadwick v. Intermountain Ry. Light & Power Co., No. 22596. The case was affirmed without opinion on July 19, 1922. The briefs show that it was a workmen's compensation case. The sole question presented was one of dependency. The attorney for the appellee was George A. Eberly, long a distinguished member of this court. If Judge Carter is right, then the court, as constituted, had no authority to hear the case. I venture the opinion that had there been any question on that matter, Judge Eberly would have raised it. He did not.

I have not undertaken herein to make a complete summary of the court's proceedings under the new Constitution. Sufficient facts from the Journals are stated to establish conclusively that this court from the beginning walked in accord with the constitutional provisions as written and as portrayed by the framers during the debates preceding the adoption. I find no record of anyone having questioned those procedures.

There were able lawyers in the practice at that time and since, who were members of the Convention. I have not felt free to consult with those who yet remain with us. I have the conviction that, had there been error in the proceedings of the court, the lawyers and judges would then have challenged them. I find no record of

any such challenge. I can see no merit in such a challenge.

Let me illustrate by reference to the case of State ex rel. Davis v. Peoples State Bank, 111 Neb. 126, 196 N. W. 912. Mr. Davis was Attorney General when this action was docketed here. He was Attorney General from January 1919 to January 1923, and hence served during the period of the Constitutional Convention and during the period that this court was establishing its procedures under the new provisions.

O. S. Spillman became Attorney General in January 1923. He was a member of the Constitutional Convention and the Committee on Judicial Department. He appeared as Attorney General for the appellant. Jacob Fawcett, long a distinguished member of this court, then in private practice, appeared for the appellee.

The case was argued and submitted to the court on September 19, 1923, before five members of this court and District Judges Redick and Shepherd. The case did not involve the constitutionality of a statute, it was not an appeal from a conviction of homicide, and it was not a review of a decision rendered by a division of the court.

If Judge Carter is correct in his position, this body that heard, considered, and decided the cause was an unconstitutionally created court, because more than five judges sat.

That hearing resulted in a judgment of reversal with three "regular judges" dissenting. Of necessity the opinion was adopted by the vote of the two district judges. If Judge Carter is right, then the case should have been affirmed at that time by a vote of three to two of the judges of this court.

Reargument was granted.

On March 20, 1924, the Journal shows a court order reciting that, because of a vacancy caused by the death of Judge Aldrich, the court was appointing Judge Redick

to serve as "Associate Judge" of this court until a successor of Judge Aldrich was appointed.

If Judge Carter is right, that order was a void order, lacking constitutional authority. It was a valid order, however, if we recognize the intent of the Constitution to have available ultimately "a full court of seven judges," so that a decision of a majority could be rendered.

At that time the Davis case stood with three judges of this court definitely against the opinion, and two judges for it.

When Judge Kokjer was appointed to sit with us in May 1955, three judges of this court were definitely for the opinion of Judge Messmore, and three judges were definitely against it. Under those circumstances we did what the court did in 1924: We appointed a district judge to make a full court of seven judges.

Reargument was had on March 21, 1924, before six of the judges of this court and Judge Redick. "A full court of seven judges" was had just as we provided "a full court of seven judges" in the instant case. The decision in the Davis case resulted in a judgment of affirmance with two judges of this court and Judge Redick dissenting.

If Judge Carter's construction of the Constitution is correct, then the court had no authority to call in a district judge to sit, for the "division" that heard the case originally was constituted of more than five judges. The fact that an affirmance would have resulted in any event does not cure the constitutional error—if it existed, and I hold it did not.

Of the six judges of this court who sat on that reargument, five had been members of the court before and during the Constitutional Convention period. The attorney for the appellant had been a member of the Constitutional Convention. The attorney for the appellee had been a distinguished member of this court.

I submit that had there been any question of the pro-

cedures followed, in that case there would have been a challenge made. No challenge appears.

A check of our Journals indicates that beginning in the late 1920's and carrying through well into the 1930's, the court was appointing a large number of district judges to act as associate judges on this court. The Journal shows that they were usually authority 2 appointments.

I propose now to walk a bit here and there in the moccasins of the court, and particularly those of Judge Carter, during that period.

On September 16, 1929, this court appointed eight district judges to sit "for the prompt submission and determination of cases." Judge Carter, then a district judge, was one of them. This was clearly an authority 2 appointment. On February 17, 18, 19, and 20, 1930, five members of this court, and Judge Carter and one other district judge, sat and heard oral argument in a total of 16 cases. Several of them were affirmed by "Per Curiam" opinion. As the Bar well knows, it has been several years since per curiam opinions were used. Judge Carter wrote opinions for the court in three of those cases which were adopted. Did 'the court have authority to appoint him, to permit his participation in the decisions and to write opinions? I find no challenge to that procedure in the reports.

In January 1935, Judge Carter became a member of this court. April 20, 21, 22, and 23, 1936, six judges of this court (including Judge Carter) and one district judge sat and heard a total of 19 cases. On October 7 and 8, 1936, five members of this court (including Judge Carter) and one district judge, sat and heard argument in six cases.

And so the record goes.

I became a member of this court in November 1938. We continued from that time until now to appoint and sit with district judges as had been done theretofore.

It would seem that the dread paralysis of judicial

acquiescence in constitutional error (if it be such) was a disease that afflicted many of the judges of this court. I find none who escape the malady.

Can it be said that the lawyers and judges participating in the Davis case and the others throughout the years could not read and understand "the plain language of the Constitution" as Judge Carter, at this late date, reads and understands it? I take it not.

The completeness of the system and its elasticity is illustrated by another amendment made in 1920. Article VI, section 12, of the 1875 Constitution provided: "The judges of the district court may hold courts for each other and shall do so when required by law."

That was amended in the 1920 Constitution so as to provide: "The judges of the district court may hold court for each other and shall do so when required by law *or when ordered by the supreme court.*" Section 12, Article V. The material amendment is emphasized. Why the amendment?

It is disclosed in the debates of the Convention. It was recognized that district judges might become disqualified or disabled, there might be vacancies that would result in retarded judicial service, and that the court work of some districts might become congested. More particularly, it was recognized that the absence of district judges, while serving here, might result in delayed judicial service in a district. Under those circumstances this court was given power to order a district judge to serve in a district other than his own. (Page 1007.) This court was given power to prevent the occurrence of that temporary void.

I now pass over the years and take up the problem which we faced in State ex rel. Johnson v. Marsh, *supra.* That was an original action filed in this court. Every member of this court at that time was a party defendant. We were all disqualified by interest. We appointed seven district judges to hear, consider, and determine the matter.

Under Judge Carter's present construction of the Constitution, the only authority that we had for doing so was that it "involved the constitutionality of a statute." But it did not.

The sole question presented by the relator was: At what date did salary increases involved in an act of the Legislature become effective? There was no allegation of unconstitutionality of the legislative act, but rather there was a question raised as to the construction of the act as to its effective date in the light of certain constitutional provisions and of certain of our earlier decisions holding earlier acts unconstitutional.

We were confronted with such decisions as that of the Supreme Court of Missouri in State ex rel. Volker v. Kirby, 345 Mo. 801, 136 S. W. 2d 319. In that case an attempt was made to question the constitutionality of an act of the Legislature by asserting that if construed a certain way it would be unconstitutional. It was admitted that a constitutional construction could be given. The court held that to raise a question of constitutionality: "* * * the contention must be that the law is unconstitutional whatever it means and under any construction of which it is susceptible. 'The only challenge of unconstitutionality of a statute which does involve such a question is the claim that the statute is inherently and totally invalid in any event.'"

We have held: "If a statute be subject to more than one construction, one of which would make the act constitutional and the other unconstitutional, the courts are required to adopt the construction which would make the act valid." Nelsen v. Tilley, 137 Neb. 327, 289 N. W. 388, 126 A. L. R. 729.

Under the Missouri case our rule would remove a charge of unconstitutionality. In the instant case no such charge was made.

A second question was presented to the court in the salary case. If we had authority to appoint district judges, could we appoint seven district judges so as to

constitute a court composed entirely of district judges?

We determined that we had the constitutional authority to appoint seven district judges to sit "temporarily as judges of the supreme court" to hear, consider, and determine the matter.

So far as I am concerned that decision was reached on the following basis: The state had created this court. It had conferred broad jurisdictional powers upon it. In the 1920 amendments the people of the state had departed from the orthodox appellate court with a fixed inelastic judicial personnel, and had provided an elastic system that authorized the use of district judges on this court. They made available for service on this court, not only the seven elected members, but the entire body of district judges of the state. They recognized that one or more judges of this court might be disqualified in a particular case. They provided for that contingency. They left no void there. They provided a complete system of judicial personnel that would enable this court to hear and determine any matter within its jurisdiction.

It was the purpose of the people to create a court with jurisdiction, power, and personnel to decide any question properly presented.

We appointed the district judges in State ex rel. Johnson v. Marsh, *supra,* and they sat, heard, considered, and decided the case favorable to the individual defendants, who, although judges of this court, in that case were litigants. The executive officers of the state accepted their decision as a controlling decision of the highest court of this state. They paid the salaries involved.

Judge Carter "acquiesced" in that procedure, decision, and the resulting action taken in accord with it.

I have one further observation.

The Constitution confers original jurisdiction on this court in all cases relating to the revenue, civil cases in which the state is a party, mandamus, quo warranto, and habeas corpus. Art. V, § 2.

One of the reasons for conferring such jurisdiction is that in those classes of cases there may arise need for prompt, authoritative, and final decision of questions presented. Our rules relating to the advancement of cases recognize that cases in that category may be advanced if they involve questions of great public interest, as they often do. Rule 16, Part I, Revised Rules of the Supreme Court.

Quite often this court is presented with procedural motions which must be decided prior to the submission of cases on the merits. Such motions are normally given priority in our work so as to prevent delay in the final submission of a case.

Suppose in either of the above situations there is one judge who is disqualified. The remaining six judges of the court see the answer differently and divide three and three. In such a case the court cannot fall back upon a decision of the trial court as an out.

If Judge Carter is correct, the court would be unable to decide the matter until such time as one judge yielded his views or there be a change of judges through the processes of election, resignation, or death. Litigation requiring prompt decision would be interminably delayed.

Surely the framers of the Constitution, who were desirous of removing and preventing delays, would not have created a void where nothing could be decided under those circumstances. Rather I contend that they created and intended to create a court that could at all times where necessary be a "full court of seven judges."

For over a third of a century this court has construed these constitutional provisions. True—the construction has not been in a decision in the sense of statements of propositions in the body of opinions. The construction, consistent throughout, has been in our practices and procedures as revealed in our reports and Journals.

Judges and lawyers have known about them. The interested public has known about them or could have known

by an examination of the Journals of our proceedings and our printed reports. Litigants have won and lost as a result of decisions made by courts so constituted. The Court of Appeals of Kentucky has succinctly stated the rule as follows: "The Constitution as written has been construed by this court, and that construction accepted and acquiesced in for many years, is as much a part of the instrument as if it had been written into it at its origin." District Board of Tuberculosis Sanitarium Trustees v. City of Lexington, 227 Ky. 7, 12 S. W. 2d 348. See, also, Shamburger v. Duncan, — Ky. —, 253 S. W. 2d 388.

For many years the work of this court has been kept current. This happy result was visioned by the Constitutional Convention. It has been achieved by the use of all of the different methods which the Convention devised and the people adopted. We have not found it necessary to sit in two divisions, as such, since 1941. We have, however, since that time sat in divisions composed of the court's own members, and divisions consisting of judges of this court and district judges.

We have generally sat as "a full court of seven judges."

To do so when necessary we have appointed, occasionally, a district judge or district judges to sit with us so that litigants would have the benefit of that judicial manpower and the expeditious decision of cases.

The methods which we have used to "clear" our docket and keep it so, have full constitutional authority.